**TEMPLETON COAL COMPANY, Inc.,**
**Plaintiff,**

v.

**The UNITED STATES of America,**
**Defendant.**

**No. 68–C–10.**

United States District Court
S. D. Indiana,
Terre Haute Division.
March 3, 1969.

Dix, Dix, Patrick, Ratcliffe & Adamson, by Thomas Patrick, Terre Haute, Ind., Baker & Daniels, by Richard E. Aikman, Indianapolis, Ind., for plaintiff.

Mark S. Rothman, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., K. Edwin Applegate, U. S. Dist. Atty., Southern District of Ind., Indianapolis, Ind., for defendant.

## MEMORANDUM OPINION

HOLDER, District Judge.

The plaintiff brings this action for refund of accumulated earnings (Section 531 I.R.C.) tax erroneously assessed for three tax years ending August 31, 1961, 1962 and 1963. The issues were presented by the three count complaint filed February 13, 1968 and the answer consisting of one defense to each count of the complaint.

Templeton Coal Company, Inc., is a corporation organized under the laws of the State of Indiana and has its principal place of business at 700 Merchants National Bank Building, Terre Haute, Indiana, 47801. On or before November 15, 1961, plaintiff filed a federal income tax return for its taxable year ended August 31, 1961, with the District Director of Internal Revenue, Indianapolis, Indiana. Subsequently, the District Director assessed against plaintiff for its taxable year ended August 31, 1961, federal income tax of $16,457.45 and interest of $5,402.78, which assessment plaintiff paid the District Director on May 15, 1967. On July 21, 1967, within the time prescribed by law, plaintiff filed a claim for refund for the federal income tax and statutory interest assessed and collected for its taxable year ended August 31, 1961 by the District Director. On October 24, 1967, the District Director issued to plaintiff a statutory notice of disallowance of that claim by certified mail. On or before November 15, 1962, plaintiff filed a federal income tax return for its taxable year ended August 31, 1962, with the District Director of Internal Revenue, Indianapolis, Indiana. Subsequently, the District Director assessed against plaintiff for its taxable year ended August 31, 1962, federal income tax of $90,307.-34 and interest of $24,228.34, which assessment plaintiff paid to the District Director on May 15, 1967. On July 21, 1967, within the time prescribed by law, plaintiff filed a claim for refund for the federal income tax and statutory interest assessed and collected for its taxable year ended August 31, 1962. On October 24, 1967, the District Director issued a statutory notice of disallowance of such claim by certified mail. On or before December 3, 1963, plaintiff filed a federal income tax return for its taxable year ended August 31, 1963, and paid the amount of income tax shown as due thereon to the District Director of Internal Revenue, Indianapolis, Indiana. Subsequently, the District Director assessed against plaintiff additional income tax and interest for its taxable year ended August 31, 1963, which assessments were finally paid by plaintiff to the District Director on May 15, 1967. Income tax of $96,869.52 and interest of $19,596.48 was attributable to Section 531 of the Internal Revenue Code of 1954. On July 21, 1967, within the time prescribed by law, plaintiff filed a claim for refund for the federal income tax and statutory interest attributable to the Internal Revenue Code Section 531, for its taxable year ended August 31, 1963. On October 24, 1967, the District Director issued a statutory notice of disallowance of such claim by certified mail.

Linton Summit Coal Company, Inc. ("Linton Summit"), was incorporated in September, 1913. John A. Templeton

and his three sons were issued 256 of the 500 outstanding shares of the Company. The Glendora Coal Company ("Glendora") was incorporated in September, 1920, and Mr. Templeton purchased individually, 600 of its 3,000 shares. Templeton Coal Company ("Templeton Coal") was also incorporated in 1920. John A. Templeton, together with his wife and children, owned 3,585 of its 4,000 outstanding shares. During 1924, Templeton Coal bought 2,100 additional shares of Glendora. In 1928, Linton Summit became a 50% stockholder in the Sherwood-Templeton Coal Company ("Sherwood-Templeton"). Glendora was liquidated in 1954 and its operating assets and real estate were transferred to Templeton Coal. At the time of its liquidation, 90% of the stock of Glendora was owned by Templeton Coal or its stockholders. The directors, President, Secretary-Treasurer and Assistant Secretary-Treasurer of Glendora and Templeton Coal were identical. In 1954, Linton Summit acquired all the assets, other than cash, of the Glas-Col Apparatus Co. for a total cash purchase price of $383,077.78. In 1960, Linton Summit was merged into Templeton Coal, so that Templeton Coal owned the operating assets and cash reserves of Glendora, and also all assets of Linton Summit, which included ownership of Glas-Col Apparatus, (thereafter operated as a division of Templeton Coal), and 50% of the stock of Sherwood-Templeton. At the time of the merger more than 86% of the stockholders of Linton Summit were stockholders of Templeton Coal. At that time four out of the five directors of both companies were identical and all officers of Templeton Coal were officers of Linton Summit. In 1959, Ayrshire Collieries Corporation purchased two operating mines owned by Sherwood-Templeton. Sherwood-Templeton distributed the receipts from the sale of those mines during 1960, 1962 and 1963, as extraordinary dividends. On May 1, 1963, Templeton Coal acquired all the stock of Powered Equipment, Inc., an engineering wholesale house, for a total purchase price of $400,000.00, which was payable over a period of five (5) years. The following is a list of the names of the deep shaft mines operated by Linton Summit, Templeton Coal and Glendora and the years of their operation:

| LINTON SUMMIT | Started | Halted |
|---|---|---|
| Templeton #1 (Old Twin) | 1918 | 1935 |
| Old Templeton #4 | 1925 | 1939 |
| New Hope #5 | 1932 | 1948 |
| New Hope #6 | 1939 | 1946 |
| New Templeton #4 (Harmony) | 1942 | 1944 |
| Regent Mine (New Harmony) | 1945 | 1955 |
| TEMPLETON | Started | Halted |
| Glendora #26 | 1920 | 1931 |
| Glendora #27 (Peerless) | 1920 | 1942 |
| St. Clair Mine | 1920 | 1921 |
| Penna Mine | 1923 | 1927 |
| Jonay Mine | 1947 | 1952 |
| GLENDORA | Started | Halted |
| Glendora #28 (Baker) | 1924 | 1951 |

Templeton Coal, as of December 31, 1961, owned approximately 20,000 acres of coal mineral rights, representing approximately 372,000,000 tons of reserves of coal in place, of which approximately 4,800 acres representing approximately 50,000,000 tons of coal in place were located in what is referred to as the "Oak-

town Field". Such mineral rights were located primarily in Sullivan, Knox and Greene Counties, Indiana. The "Oaktown Field" was located entirely in Knox County, Indiana, at that time. Linton Summit and Templeton Coal instituted a program of acquisitions of other operating businesses in 1954 (Glas-Col Apparatus Co.) for the purpose of:

(a) Preserving capital for re-entry into deep coal mining operations.

(b) Diversifying and stabilizing the production of income.

(c) Maintaining an executive organization.

(d) Providing income from which to pay dividends to stockholders.

During the taxable years in question, Templeton Coal had approximately fifty direct stockholders and eight nonstockholder beneficiaries of various trusts which owned stock. The total number of shares of stock issued and outstanding during the years in question was eleven thousand (11,000) shares of common capital stock. The largest number of shares held directly by any stockholder were held by Flora I. Anstead and Ethel L. Scofield, who owned 700 shares each. Each of them also owned a beneficial interest in an additional 438 shares. Neither of said stockholders has ever served as a director of either Templeton Coal, Linton Summit or Glendora, during the years in question. Ethel Scofield attended only one stockholders' meeting and a directors' meeting following, and Flora Anstead never attended any meeting. The directors of Templeton Coal during the taxable years in question, and the number of shares of stock, owned by each of them (or their spouses), were as follows:

| | NAME | SHARES |
|---|---|---|
| | Phillip H. Templeton | 450 |
| | Max A. Matthews | –0– |
| | John A. Templeton | 50 |
| | Thomas M. Patrick | –0– |
| (Spouse) | J. Victor Briggs | 390 |
| (Spouse) | Joseph W. Anstead | 700 |

On May 1, 1965, Templeton Coal acquired all the stock of Plumb Supply Company for $690,165.77 and all the stock of Plumb Supply, Inc., for $305,-354.38, in cash. In August, 1967, Sherwood-Templeton redeemed the 50% of its stock not owned by Templeton Coal, and thereby became a wholly owned subsidiary of Templeton Coal. Sherwood-Templeton had been and continues to be the operator of the Pioneer Mine, a strip mine, near Laura, Illinois, and it also owns a 30% interest in Calvert and Youngblood Coal Company, which operates a strip mine near Birmingham, Alabama.

The combined corporations (Glendora, Linton Summit and Templeton Coal), paid dividends from one, two or all of said corporations every year from 1923 through 1963, both inclusive, except 1925, 1928 and 1933, ranging in total from a low of $10,000.00 in 1929 to a high of $510,000.00 in 1949. The combined net worth of the three corporations (exclusive of plaintiff's "excess depletion reserve") at the end of each of the fiscal years from 1949 to 1963 was as follows: Said excess depletion reserve was a constant figure from 1949 to 1963.

| End of Fiscal Year | Total Net Worth |
|---|---|
| 1949 | $5,197,540.00 |
| 1950 | 5,026,507.00 |
| 1951 | 4,886,137.00 |
| 1952 | 4,692,661.00 |
| 1953 | 3,955,659.00 |
| 1954 | 3,426,056.00 |
| 1955 | 3,214,527.00 |
| 1956 | 3,128,108.00 |
| 1957 | 3,258,782.00 |
| 1958 | 3,354,133.00 |
| 1959 | 3,424,619.00 |
| 1960 | 3,797,000.00 |
| 1961 | 3,877,531.00 |
| 1962 | 4,144,167.00 |
| 1963 | 4,436,759.00 |

The total taxable income, (before deductions for dividends received credit, or net operating loss deductions), the dividends paid, the federal income taxes

paid, and the increase or decrease in retained earnings of the three combined corporations for the years 1950 to 1963, inclusive, are as follows:

| Year | Total Taxable Income | Federal Income Tax | Dividends Paid | Retained Earnings Decrease | Increase |
|------|---------------------|--------------------|--------------------|--------------------|----------|
| 1950 | $ 258,098.00 | ($18,117.00) | ($442,500.00) | ($202,519.00) | |
| 1951 | (50,656.00) | (3,232.00) | (240,000.00) | (293,888.00) | |
| 1952 | (19,864.00) | * 546.00 | (82,500.00) | (101,818.00) | |
| 1953 | (170,376.00) | *1,465.00 | (60,000.00) | (228,911.00) | |
| 1954 | (387,511.00) | –0– | (60,000.00) | (447,511.00) | |
| 1955 | (122,843.00) | –0– | (60,000.00) | (182,843.00) | |
| 1956 | (32,139.00) | –0– | (44,970.00) | (77,109.00) | |
| 1957 | 166,937.00 | –0– | (60,000.00) | | $106,937.00 |
| 1958 | 160,818.00 | –0– | (60,000.00) | | 100,818.00 |
| 1959 | 115,107.00 | (8,882.00) | (60,000.00) | | 46,225.00 |
| 1960 | 476,125.00 | *9,171.00 | (111,000.00) | | 374,296.00 |
| 1961 | 168,941.00 | –0– | (88,000.00) | | 80,941.00 |
| 1962 | 375,635.00 | –0– | (110,000.00) | | 265,635.00 |
| 1963 | 417,461.00 | (19,480.00) | (110,000.00) | | 287,981.00 |
| | $1,355,733.00 | ($38,529.00) | ($1,588,970.00) | ($271,766.00) | |

* Net Refunds

The three combined corporations suffered net operating losses in each of the years 1951, 1952, 1953, 1954, 1955 and 1956, but paid substantial regular dividends in each of said loss years. The plaintiff opened its Jonay Mine in 1947 and ceased operating it in 1952, but has continued to keep it pumped and ventilated up to the present date. In the period following World War II, deep mining of coal in Indiana became increasingly difficult from an economic standpoint due to various factors; among those factors were:

(a) Strip mine production, with its much lower cost of production;

(b) Dieselization of railroads.

During the years following World War II, the demand for coal increased substantially due to the increases in electric power consumption and the adoption by the electric utility companies of the concept of locating their power generating plants in or near available coal and water supplies. Plaintiff's "Oaktown Field" is located on both sides of the Wabash River in Knox County, Indiana, and Crawford and Lawrence Counties, Illinois. A major portion of the coal reserves acquired by plaintiff in Indiana was acquired years prior to the taxable period in question; plaintiff has through the years since continued to acquire and explore for coal in this field, and since 1961, has acquired an additional 1,409 acres of mineral rights and options to purchase an additional 2,423 acres of mineral rights, mostly on the Illinois side of the Wabash River and all in the Oaktown Field. This coal is approximately 400 feet deep and available only for deep mining. During the taxable years in question, it was generally believed in the coal industry and by plaintiff's board of directors that strippable coal reserves in Indiana, and particularly in those areas in which plaintiff's coal reserves were located, were committed to existing power contracts and demands of the electric generating industry, and that in a relatively few years, projected demands would make plaintiff's known deep coal reserves, particularly in the Oaktown Field, economically and profitably minable. However, during the taxable years in question, there was a significant breakthrough in strip mining technology; shovel and dragline capacities increased from a previous size of approximately 30 to 35 cubic yards to a dragline size of 75 cubic yards in 1964, which was the largest dragline size then in use in Indiana. The increase in bucket capacity has con-

tinued and buckets presently in use in the area are in excess of 140 cubic yards in capacity. The depths at which coal could be stripped in the general area of the fields involved advanced at the same time from an average of about 40 to 50 feet of depths of overburden to depths in excess of 100 feet. This advance in technology opened up for mining by the strip method, coal reserves which had previously been considered available only by deep mining and delayed the time at which plaintiff believed its deep coal reserves would come into demand and become economically minable by deep mining. Strippable coal reserves in the Indiana coal fields generally and in the areas in which plaintiff's reserves are located are now, in the opinion of coal experts, almost completely committed to existing power facilities in the area, and in order to provide coal for projected expansion, it is believed by experts in the industry and by plaintiff's directors that the time when their coal reserves, particularly in the Oaktown Field, will be in demand and economically minable, is once again imminent. Mining experts are of the opinion that coal for presently projected power facility demands in the future must come from deep coal reserves by deep mining methods as opposed to stripping. Joint venture or syndicated type operations between separate companies are not uncommon in the coal mining industry; plaintiff has been in active negotiation with other coal companies for a joint venture type of operation between plaintiff and another coal company during the past two years in connection with its Oaktown Field. Plaintiff has consistently refused to consider a sale or royalty lease arrangement on its Oaktown Field and will only consider an arrangement in which plaintiff would participate in the mining operation. Such a mining venture would require capital outlays which would necessitate the use of all of plaintiff's existing resources and also substantial borrowings. By the very nature of the coal industry, as distinguished from non-extractive commercial businesses generally, planning periods necessary for the acquisition of properties, negotiation of sale contracts, planning, designing, constructing and equipping a deep coal mine encompass long periods of many years.

During the taxable years before the Court, earnings and profits of plaintiff were accumulated for the reasonable needs of its business, including the reasonably anticipated needs of its business. The avoidance of surtax on its shareholders was not a purpose of any accumulation of earnings and profits by plaintiff during any of the taxable years before the Court. For the taxable year 1961, plaintiff is entitled to a refund of taxes and interest in the sum of $21,860.23, plus interest at 6% per annum from May 15, 1967. For the taxable year 1962, plaintiff is entitled to a refund of taxes and interest in the sum of $114,535.68, plus interest at 6% per annum from May 15, 1967. For the taxable year 1963, plaintiff is entitled to a refund of taxes and interest in the sum of $116,466.00, plus interest at 6% per annum from May 15, 1967.

The Court has jurisdiction of the parties and subject matter of the action. Title 28 U.S.C.A. Section 1346(a) (1). The plaintiff has maintained its burden of proof of each of the essential elements and alleged facts of each of the elements of its claims in counts one, two and three of the complaint. The plaintiff has proven by a preponderance of the evidence that the defendant erroneously assessed and collected from the plaintiff a tax under Section 531 of the Internal Revenue Code (accumulated earnings tax) for the taxable years of plaintiff ending August 31, 1961, August 31, 1962 and August 31, 1963. The plaintiff has proven by a preponderance of the evidence that plaintiff was not formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation by permitting its earnings and profits to accumulate during the years in question or any of them, instead of being divided or dis-

tributed. The plaintiff has proven by a preponderance of the evidence that the plaintiff's accumulations of income for each of the tax years in issue were not subject to the tax imposed by Section 531 of the Internal Revenue Code. The law is with the plaintiff and against the defendant. Plaintiff should have judgment against the defendant on each of the three counts of plaintiff's complaint as follows:

First Count—Judgment for plaintiff in the sum of $21,860.23 plus statutory interest thereon from May 15, 1967, and costs.

Second Count—Judgment for plaintiff in the sum of $114,535.68 plus statutory interest thereon from May 15, 1967, and costs.

Third Count—Judgment for plaintiff in the sum of $116,466.00 plus statutory interest thereon from May 15, 1967, and costs.

It is therefore adjudged that the plaintiff have and recover from the defendant the sum of $252,861.91 together with interest thereon at the rate of six per centum (6%) per annum or according to law, and that the Clerk assess the costs of this action against the defendant.