GOLCONDA MINING CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT*

Docket Nos. 4352–67, 4940–68.   Filed April 27, 1972.

*F. A. LeSourd, Woolvin Patten*, and *Robert L. Magnuson*, for the petitioner.

*Stephen E. Silver* and *Richard J. Shipley* for the respondent.

DAWSON, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Docket No. | Year ended December 31— | Deficiency |
|---|---|---|
| 4352–67 | 1962 | $37, 114. 85 |
| | 1963 | 56, 568. 72 |
| | 1964 | 75, 025. 72 |
| 4940–68 | 1965 | 53, 179. 89 |
| | 1966 | 54, 681. 67 |

*Supplemental Opinion at p. 736.

Certain concessions have been made by the parties. The only issue to be decided is whether petitioner is subject to the accumulated-earnings tax imposed under section 531 [1] for the years 1962 through 1966.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Golconda Mining Corp. (herein called Golconda) is a corporation organized under the laws of the State of Idaho whose principal office was located in Wallace, Idaho, at the time it filed its petitions in these cases. Golconda filed its Federal corporate income tax returns for the calendar years 1962 through 1966 with the district director of internal revenue at Boise, Idaho.

### Company History

Golconda was incorporated in Idaho in 1927 as Golconda Lead Mines, Inc. In 1962 its name was changed to Golconda Mining Corp. and in 1970 its name was shortened to the Golconda Corp. In 1927 Golconda acquired properties in the eastern part of the Coeur d'Alene mining district north of the Osburn Fault between Wallace and Mullan, Idaho.

The Coeur d'Alene mining district of Idaho is approximately 30 miles long by 20 miles wide and is one of the principal mining districts in the world, producing mainly lead, zinc, silver, and byproducts of copper and gold. Mining in the area commenced in the 1880's, and it remains so productive that in the last few years it has produced 40 to 50 percent of the nation's silver. The principal geologic feature of the Coeur d'Alene district is the Osburn Fault, which runs approximately east-west through the area. In the eastern part of the Coeur d'Alene district the deposits occur to the north of the fault, and in the western part of the district they occur to the south of the fault.

From 1927 to 1956, except for the period 1940–1947, Golconda conducted active mining operations on its property. The principal mineral extracted was lead although some silver and zinc were also mined. During this period the net smelter returns from the mine were approximately $4,300,000.

After its mining operations were terminated in 1957, due to declining metal prices, rising costs, and exhaustion of known ore reserves, Golconda continued to operate its mill to process ore from the Lucky Friday Silver Lead Mines (herein called Lucky Friday). Lucky Friday is located to the east of the Golconda property in the Coeur d'Alene area and has been affiliated with Golconda since the early

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

1940's when Golconda provided a significant portion of the financing necessary for Lucky Friday to commence mining operations. In return for advancing funds to Lucky Friday, Golconda received 155,000 shares of Lucky Friday stock out of approximately 1,200,000 shares issued and outstanding. Golconda thus became Lucky Friday's single largest shareholder and exercised control over its management until 1958.

In January 1959, after Lucky Friday had demonstrated increased ore reserves at a depth of over 3,000 feet, Hecla Mining Co. (herein called Hecla) acquired the Lucky Friday stock of two large shareholders. Hecla also made a tender offer to the remaining Lucky Friday shareholders for their stock. As a result of these transactions, Hecla acquired 38 percent of the outstanding stock of Lucky Friday. Hecla's president, Lester J. Randall, and general manager, William Love, assumed similar positions with Lucky Friday and became members of its five man board of directors. Thereafter, Hecla controlled the management of Lucky Friday although Golconda continued to be represented on the Lucky Friday board of directors by its vice president, Harry F. Magnuson. In 1964, Lucky Friday was merged into Hecla with 1.5 shares of Hecla stock being exchanged for each share of Lucky Friday.

At the beginning of 1959, Hecla announced that a 500-ton mill would be constructed on the Lucky Friday property. This mill began operation in February 1960. Golconda then closed down its mill which had been processing Lucky Friday ore and placed it on a standby basis.

On its Federal corporate income tax return for the year 1957, Golconda notified the Internal Revenue Service that:

Due to the depressed price of metals during the year 1957, the company's mining operations were terminated. All equipment was removed from the mine in order to avoid expensive underground maintenance costs. Should the metal market continue its depressed status forcing a prolonged shutdown, rehabilitation of the present mine workings would be impossible. An increased charge for amortization and depletion of mine facilities was taken in view of the above-mentioned conditions.

On its Federal corporate income tax return for the year 1958, Golconda notified the Internal Revenue Service that: "The mine workings of the company have become fully depleted, the equipment removed and sold, and the workings abandoned."

On October 24, 1960, Golconda and the Internal Revenue Service entered into a closing agreement whereby Golconda was allowed to deduct as an abandonment loss the remaining unrecovered costs as of January 1, 1957, relating to the "Mayflower Tunnel" and "East Drift" which were Golconda's only active mine workings. The Mayflower Tunnel was the main and only opening to the Golconda mine. Gol-

conda was also allowed to write off unrecovered costs of prepaid mining expenses as of January 1, 1957. Harry F. Magnuson, vice president, and Daniel H. Camp, a former secretary-treasurer, negotiated the closing agreement on behalf of Golconda.

### Company Activity After Hecla Takeover of Lucky Friday

Following the takeover of Lucky Friday by Hecla and the announcement of Lucky Friday's new mill, the directors of Golconda gave consideration to the future of the company. Because of the developments at depth in the Lucky Friday and other mines in the area, they believed the Golconda property, particularly its east side and land adjoining it on the east, had merit for an exploration program. This was based upon the similarity of certain formations in the eastern part of the Golconda area with those appearing in the Lucky Friday area.

The property situated between the Golconda and Lucky Friday mines was practically unexplored north of the Osburn Fault, except for the No. 6 tunnel of the Morning mine. This unexplored area constituted a relatively large unexplored property within the Coeur d'Alene district.

In considering the possibility of a major exploration of the Golconda area at some depth, Golconda's directors realized that its source of financing for such a project would have to consist of its dividend income distributed by Lucky Friday, a mining company it no longer controlled, and gains from the liquidation of investment holdings. The directors were aware of the risk of such a program and the problems involved in commencing an exploration program which was underfinanced. Therefore, the initial idea of the directors was to interest a major company in participating in such an exploration program with Golconda supplying the property to be explored and the other company supplying the necessary funds.

A gradual shift in this direction was made by Golconda in 1959. Control of the Square Deal Mining Co. and a substantial interest in the United Lead-Zinc Mines Co. were acquired. In its annual report to shareholders for 1959, Golconda reported:

The company's mining property remained idle throughout the year. Golconda owns a controlling stock interest in Square Deal Mining and Milling Company which owns the property lying to the northeast of the Golconda property. In addition, Golconda holds a substantial stock interest in United Lead-Zinc Mines Company which is the owner of the property lying to the east of the Golconda property. Preliminary steps have been taken which might lead to further exploration of Golconda's property holdings. Several areas geologically attractive for ore deposition are indicated and an extensive exploration program might be warranted whenever higher metal prices prevail.

In its annual report to shareholders for 1961 and in each annual report thereafter through at least 1969, Golconda included a map of the

Coeur d'Alene district and its property interests within the district. By December 31, 1966, Golconda's interests were as follows:

GOLCONDA OWNERSHIP

Golconda group 100% property interest
Deep Wonder 100% property interest
West Star 100% property interest
Western Pacific 100% property interest
Seattle 100% property interest
Anderson 90% mineral rights
Square Deal 53.1% stock interest
United Lead-Zinc 40.5% stock interest
Alice Silver-Lead 52.2% stock interest
Mullan Silver-Lead 48.6% stock interest
Granada 31.0% stock interest
Bell 40.4% stock interest
Mullan Metals, Inc. 42.7% stock interest
Ivanhoe Mining Co., Ltd. 23.9% stock interest

The following table indicates the extent of and approximate market value of Golconda's interests in mining companies with landholdings in the Golconda area. Also shown are the aggregate cost and approximate market value of Golconda's interests in other mining companies with properties within the Coeur d'Alene district, mining companies outside the Coeur d'Alene district, and Golconda's investments in nonmining companies:

COST, RELATIVE INTEREST, AND APPROXIMATE MARKET VALUE OF GOLCONDA'S STOCKHOLDINGS IN MINING COMPANIES WITHIN THE GOLCONDA AREA AND COST AND APPROXIMATE MARKET VALUE OF GOLCONDA'S HOLDINGS IN OTHER MINING AND NONMINING COMPANIES AS OF DEC. 31

| | 1961 | | | 1962 | | |
|---|---|---|---|---|---|---|
| | Cost | Per-cent owned | Approximate market value | Cost | Per-cent owned | Approximate market value |
| Mining companies in the Golconda area: | | | | | | |
| Lucky Friday Silver-Lead Mines___ | $20,000 | 12 | $4,185,000 | $17,080 | 10.8 | $4,212,000 |
| Hecla Mining Co_____ | 280,039 | 2.7 | 427,500 | 791,446 | 6 | 1,005,500 |
| Square Deal Mining & Milling Co___ | 47,064 | 47 | 50,539 | 47,551 | 47.1 | 42,500 |
| United Lead-Zinc Mines Co_____ | 8,549 | 9.5 | 12,799 | 10,492 | 11.1 | 12,500 |
| Alice Silver-Lead Mining Co_____ | 2,281 | 11 | 3,300 | 8,431 | 12.5 | 10,000 |
| Black Bear Mines_____ | | | | 10,814 | 68.7 | 10,800 |
| Other mining companies within Coeur d'Alene mining district_____ | 32,351 | _____ | 40,987 | 142,328 | _____ | 222,700 |
| Other mining companies_____ | 61,758 | _____ | 68,875 | 204,311 | _____ | 242,100 |
| Nonmining companies_____ | 66,817 | _____ | 71,845 | 68,336 | _____ | 81,900 |
| Total securities_____ | 518,859 | _____ | 4,860,845 | 1,300,789 | _____ | 5,840,000 |

| | 1963 | | | 1964 | | |
|---|---|---|---|---|---|---|
| | Cost | Per-cent owned | Approximate market value | Cost | Per-cent owned | Approximate market value |
| Mining companies in the Golconda area: | | | | | | |
| Lucky Friday Silver-Lead Mines___ | $16,180 | 10.4 | $4,314,800 | _____ | _____ | _____ |
| Hecla Mining Co_____ | 1,040,030 | 7.5 | 1,812,600 | $1,433,895 | [1] 13 | $10,149,500 |
| Square Deal Mining & Milling Co____ | 49,826 | 49.6 | 49,800 | 54,979 | 53.1 | 207,900 |
| United Lead-Zinc Mines Co_____ | 50,015 | 35.4 | 68,400 | 55,258 | 37 | 309,700 |
| Alice Silver-Lead Mining Co_____ | 20,484 | 24.8 | 20,500 | 48,938 | 51.4 | 48,900 |
| Black Bear Mines_____ | 10,814 | 68.7 | 10,800 | 10,814 | 68.7 | 10,800 |
| Granada Lead Mines_____ | 5,933 | 23.7 | 6,000 | 7,233 | 25.7 | 7,200 |
| Mullan Silver-Lead_____ | 10,225 | 44.3 | 10,225 | 12,275 | 45.8 | 12,300 |
| Bell Mining Co_____ | | | | 15,000 | 40.4 | 15,000 |
| Other mining companies within Coeur d'Alene mining district_____ | 820,120 | _____ | 1,270,450 | 1,071,210 | _____ | 1,796,600 |
| Other mining companies_____ | 78,724 | _____ | 68,425 | 286,604 | _____ | 383,100 |
| Nonmining companies_____ | 51,418 | _____ | 21,000 | 33,718 | _____ | 9,000 |
| Total securities_____ | 2,153,769 | _____ | 7,653,000 | 3,029,924 | _____ | 12,950,000 |

| | 1965 | | | 1966 | | |
|---|---|---|---|---|---|---|
| | Cost | Per-cent owned | Approximate market value | Cost | Per-cent owned | Approximate market value |
| Mining companies in the Golconda area: | | | | | | |
| Hecla Mining Co_____ | $1,461,757 | 13 | $8,356,219 | $2,123,735 | 13.3 | $13,914,800 |
| Square Deal Mining & Milling Co____ | 54,979 | 53.1 | 193,726 | 62,479 | 53.1 | 185,251 |
| United Lead-Zinc Mines Co_____ | 65,575 | 38.7 | 276,727 | 82,765 | 40.5 | 392,284 |
| Alice Silver-Lead Mining Co_____ | 48,938 | 51.4 | 48,938 | 52,098 | 52.2 | 52,098 |
| Black Bear Mines_____ | 10,814 | 68.7 | 10,814 | 10,814 | 68.7 | 10,814 |
| Granada Lead Mines_____ | 8,619 | 30.2 | 8,619 | 9,519 | 30.2 | 9,519 |
| Mullan Silver-Lead Co_____ | 12,329 | 45.8 | 12,329 | 28,810 | 48.6 | 275,289 |
| Bell Mining Co_____ | 15,000 | 40.4 | 15,000 | 15,000 | 40.4 | 15,000 |
| Mullan Metals, Inc_____ | 8,530 | 42.7 | 8,530 | 9,446 | 42.7 | 9,446 |
| Ivanhoe Mining Co_____ | 3,500 | 23.4 | 3,500 | 4,690 | 23.9 | 4,690 |
| Great Eastern Mining_____ | | | | 5,000 | 13 | 5,000 |
| Other mining companies within Coeur d'Alene mining district_____ | 916,289 | _____ | 1,301,338 | 441,571 | _____ | 519,071 |
| Other mining companies_____ | 281,968 | _____ | 189,560 | 281,968 | _____ | 190,738 |
| Total securities_____ | 2,888,298 | _____ | 10,425,300 | 3,127,895 | _____ | 15,584,000 |

[1] Golconda received 203,850 shares of Hecla Mining Co. in exchange for its Lucky Friday stock which had a cost basis of $20,257 at the time of the exchange.

In 1963 Golconda purchased the "Western Pacific" and "West Star Group" of patented mining claims for $3,050. In 1964, the "Seattle" and "Minneapolis" patented mining claims were acquired at a cost of $5,457. In 1965 Golconda purchased the Anderson Ranch property for $30,350. Between 1962 and 1966, a total of $42,246 was spent on these and similar acquisitions, including the capitalization of costs incurred in connection with their maintenance.

With the exception of these few transactions, the acquisitions of adjoining properties were made through purchases of stock rather than by direct land purchases. This method was used because these proper-

ties were the principal assets of the companies involved and their shareholders were generally reluctant to permit such sales. However, individual shareholders were occasionally willing to sell their stock and the nonoperating companies themselves were willing to sell treasury or newly issued stock since part of the consideration was Golconda's agreement to undertake the assessment work required to maintain any unpatented mining claim.

These unpatented mining claims, unlike patented mining claims which create complete ownership rights in the person applying for and receiving the patent without further assessment work, must be annually worked upon and only constitute a right of exploration and not ownership of the ground. If annual assessment work on an unpatented claim is not performed, the claim may be subject to for-feiture. Thus, Golconda's assumption of the burden of performing the required assessment work relieved the nonoperating company of having to perform at least $100 worth of work on each of its unpatented claims annually. In 1961, and prior to that year, Golconda was performing assessment work on its own unpatented claims and on 5 such claims for Square Deal, 22 for United Lead-Zinc, 12 for Mullan Silver-Lead, and 10 for Granada. This work consisted of maintenance of portals, deepening of existing openings, making discovery cuts, construction and maintenance of roads and bulldozer cuts for geological study purposes, and was done by Wray Featherstone, the president of Golconda, or others employed by Golconda for this purpose. A geological study by Shenon & Full, mining geologists, was used to satisfy part of this obligation. Golconda also prepared and filed the necessary proofs of labor on these claims.

As early as 1961, Wray Featherstone, Golconda's president, and the general superintendent and chief geologist at Hecla discussed the possibility of conducting an exploration project in the Golconda area. The prospects for such a program, as well as the possibility of a merger of Golconda into Hecla, were discussed on numerous occasions between representatives of these companies between 1961 and 1969. Since Hecla was operating Lucky Friday and the Star Morning property nearby and had a staff of able mining personnel familiar with deep exploration in the area, Golconda viewed Hecla as the most desirable mate for a merger or joint exploration program.

At the annual meeting of shareholders for 1963, Featherstone disclosed that Golconda was attempting to either consolidate all the property in the area into one company or unitize the area under a common working agreement. At the November 5, 1963, directors meeting, Featherstone indicated that a geological survey of the area should be obtained. He added that it was his opinion that between $3 million and $5 million would be necessary to finance a long-range development program. On January 24, 1964, Shenon & Full, mining geologists, were

contacted regarding the preparation of a geological study of the area. On March 10, 1964, Golconda's directors authorized this study. A report was received by Golconda and presented to the directors at their meeting held November 9, 1964. The report recommended deep exploration in two parts of the Golconda area and projected the costs of exploration to be approximately $2,152,500 if the Star Mine access was used or $2,902,500 if an independent shaft had to be sunk. Because this program was risky, the directors, led by Harry F. Magnuson and Wray Featherstone, were opposed to liquidating part of the company's stock interest in Hecla. They feared that if the program proved to be a failure, Golconda would be left without a substantial part of its principal asset. Accordingly, Golconda continued to acquire greater interests in the property in the area and maintained its efforts to locate a major company to supply the needed funds for exploration. As of December 31, 1964, the projected cost to acquire the land necessary for the exploration program recommended by Shenon & Full was thought to be as high as $1 million. The actual cost was ultimately $456,790.

Prior to the years in issue Golconda formulated plans to acquire control of the area necessary for an exploration program through the purchase of stock in the nonproductive mining companies owning the land. Golconda also had formulated plans to bring about the exploration itself by interesting some large company in the project. These plans contemplated that this company would provide at least part of the financing and the wherewithal for the exploration of the area.

During the period 1962–66 Golconda was engaged in the process of attempting to secure the joint participation of a major active mining company. Finally, in 1969, Hecla and Golconda entered into a preliminary agreement for a joint exploration of the Golconda area. The specific properties involved were placed in a new corporation, Alice Consolidated Mines, Inc., with Golconda owning approximately 54 percent of the company's outstanding capital stock. Golconda is to supply 20 percent of the preproduction costs and receive a 20-percent interest in the operating lease. After recovering their respective shares of preproduction costs, net profits will be apportioned as follows: 50 percent to Alice Consolidated, 40 percent to Hecla, and 10 percent to Golconda. Golconda's initial cash expenditure was projected to be from $400,000 to $1,200,000 and was scheduled to be made during 1971. Hecla has retained the right to abandon this venture after fulfilling certain minimum requirements under the contract. Hecla would exercise this right only in the event drilling became virtually impossible or the project was no longer economically sound.

The preliminary plans are to sink a vertical shaft to a depth of approximately 2,000 feet. Access will be through the Anderson Ranch. Although this shaft will cost more initially, waste from the exploration will not be a burden as it would be to the production of ore at the

Star mines whose shaft was also considered as an access point for this exploration. In addition, no continuing royalty for the use of that shaft will have to be paid under this plan. Moreover, the parties had known for some time that the Star mine shaft was not the proper access for this exploration program. Hecla and Golconda ultimately agreed to enter into this joint exploration program after determining that it was the most acceptable means of developing the Golconda area. The notion of a merger or sale was thoroughly explored prior to the acceptance of this plan. Considered were an offer by Sunshine Mining Co. to purchase all of the stock of Golconda at $10 per share and a proposal for merger calling for the exchange of three shares of Golconda for each share of Sunshine. American Smelting & Refining Co. (ASARCO) offered to exchange 250,000 of its shares for all of the assets of Golconda. In the latter part of 1965 ASARCO and Hecla jointly proposed to buy the stock of Magnuson and Featherstone and make a tender offer to the balance of the Golconda shareholders. A total of 900,000 shares was to be purchased. If the offer was oversubscribed, the stock was to be purchased on a prorata basis, including the stock of Magnuson and Featherstone. This offer was coupled with a proposed exploration program. It was ultimately rejected. During this same period numerous companies were contacted regarding a possible merger with Golconda or exploration of the area. Companies so contacted included Gold Fields, Inc., Martin Marietta, Bunker Hill, Newmount Mining Co., Denison Mines of Canada, and Phillips Petroleum. Day Mines also evidenced some interest.

In March 1966 Hecla suggested that Golconda distribute its Hecla stock to its shareholders and then Hecla would enter into an exploration agreement with the remaining company. This proposal was also rejected because of the substantial income tax liability which would have been imposed upon Golconda's shareholders. Nevertheless, Golconda advised Hecla of its continued interest in consummating a merger on a tax-free basis.

On May 20, 1966, Hecla proposed that Golconda should be merged into Hecla, using the market prices of the respective stocks on that date to determine the exchange ratio. One share of Hecla was equal to 5.93 shares of Golconda on that date. Hecla would have distributed 330,000 shares of its stock to Golconda's shareholders and received back 320,000 of its own shares held by Golconda. Magnuson discussed this proposal with Hecla's officers and pointed out that Golconda's debt had nearly been eliminated after substantially reducing its interest in Bunker Hill and that Golconda was acquiring its own stock to reduce the number of Hecla shares necessary for distribution in the event of a merger. Hecla indicated its desire to proceed with an exploration program for the Golconda area. However, an exchange ratio could not be

agreed upon and further merger discussions were terminated. On May 19, 1967, Hecla advised Golconda by letter that an agreement for a joint exploration program could still be worked out and proposed that a meeting be held for this purpose. As noted above, such an agreement was finally consummated in June 1969.

Before this agreement was obtained, however, two significant events occurred. In 1968 the price of Golconda stock reached approximately $20 per share which Magnuson viewed as high. Magnuson was also skeptical of the possibility of a tax-free merger between Hecla and Golconda. Therefore, Magnuson transferred substantially all his Golconda stock to H. F. Korholz in 1968 at $18.50 per share. Also, in October 1968, shortly after Magnuson terminated his interest in Golconda, Hecla and El Paso Natural Gas Co. (El Paso) entered into negotiations which called for the issuance of 1 million shares of Hecla in exchange for a one-half interest in certain mining claims and mineral leases in Pinal County, Ariz. This was to be accompanied by an operating agreement under which Hecla was to provide the funds to bring the property into production. Golconda opposed this proposed transaction since it would materially reduce Hecla's dividend-paying capacity and could reduce the market value of its stock. Golconda filed suit to block the transaction but was unsuccessful.

### Golconda Investments and Securities Transactions

Immediately after Hecla gained control of Lucky Friday, Golconda initiated a program of acquiring Hecla stock. In 1960 Magnuson became a member of the Hecla board of directors and executive committee, representing Golconda. Magnuson would have become a member of Hecla's executive committee and board of directors, however, regardless of Golconda's ownership of Hecla stock because of his close ties with the management of Hecla. The Golconda board believed that an investment in Hecla would provide their company with leverage in obtaining a merger or joint exploration program with Hecla. The Golconda board also believed that this interest would be increased upon the inevitable merger of Lucky Friday into Hecla. Between 1958 and 1966, Golconda's holdings of Hecla stock were as follows:

| Date | Number of shares | Cost | Approximate market value |
|---|---|---|---|
| 12/31/58 | 3,000 | $32,432.98 | $31,500 |
| 12/31/59 | 27,800 | 260,498.98 | 264,100 |
| 12/31/60 | 37,000 | 337,828.98 | 365,375 |
| 12/31/61 | 30,000 | 280,039.43 | 427,500 |
| 12/31/62 | 67,500 | 791,446.17 | 1,005,500 |
| 12/31/63 | 85,000 | 1,040,030.41 | 1,812,600 |
| 12/31/64 | [1] 305,250 | 1,433,895.22 | 10,149,500 |
| 12/31/65 | 305,250 | 1,461,756.87 | 8,356,219 |
| 12/31/66 | 323,600 | 2,123,734.57 | 13,914,800 |

[1] 205,650 shares of Hecla stock were received in connection with the merger of Lucky Friday into Hecla in 1964.

During these years Golconda took advantage of swings in prices of securities and this included sales and repurchases of Hecla and Lucky Friday stock. In 1962 Golconda adopted the policy of selling Lucky Friday stock and buying Hecla stock since Lucky Friday had advanced sharply in price. At one point it was possible to sell one share of Lucky Friday, purchase two shares of Hecla, and have funds remaining with which to pay the capital gains tax. Golconda also engaged in short sales of Lucky Friday stock. Technically, these were sales against the box and involved sales of shares actually owned by Golconda with delivery postponed. This gave Golconda the option of covering the sales with stock it already owned or with newly purchased shares. This enabled Golconda to minimize its capital gains tax liability by covering the sales with stock having a higher basis for tax purposes. Golconda could also observe the direction of the price of Lucky Friday stock before deciding how to close out the transaction.

In 1961 Golconda began acquiring stock in the Bunker Hill Co. which is a fully integrated mining company with a complex of metallurgical plants, a lead smelter, a zinc smelter, and a sulphuric acid plant. Golconda's motives for making these acquisitions were threefold. First, the price of Bunker Hill stock was very low as a result of a severe drop in metal prices and based on a $7.50 to $8 per share selling price in 1962, the entire company was only valued at approximately $12 million while its assets could not be replaced for less than $200 million to $300 million. In addition to being attractive purely as an investment, Bunker Hill was also the largest owner of the Star Morning property located nearly adjacent to the Golconda property. It was felt that taking a substantial position in Bunker Hill's stock could also assist Golconda in its efforts to unitize the area for an exploration program and in its efforts to effect a merger between itself and Hecla or Bunker Hill, Golconda, and Hecla. In the latter part of 1964 Golconda began selling its stock in Bunker Hill and during 1965 liquidated the bulk of its investment in that company.

Between 1960 and 1966 Golconda received dividend income and realized short- and long-term capital gains from its transactions in securities as follows:

| | 1960 | 1961 | 1962 | 1963 |
|---|---|---|---|---|
| Dividends | $109,962.50 | $172,410.00 | $228,821.50 | $309,553.01 |
| Interest | 2,059.01 | 756.00 | 71.82 | |
| Long-term capital gains | | 40,700.36 | 425,508.72 | 337,261.97 |
| Short-term capital gains | | 13,506.59 | 42,304.05 | 48,506.60 |
| Other income | 9,965.70 | 106.97 | | 185.69 |
| Total income | 121,987.21 | 227,479.92 | 696,706.09 | 695,507.27 |
| Percent of total income from dividends | 90.14 | 75.79 | 32.84 | 44.51 |
| Percent of total income from capital gains | | 23.83 | 67.15 | 55.46 |
| Percent of total income from dividends and capital gains | 90.14 | 99.62 | 99.99 | 99.97 |

|  | 1964 | 1965 | 1966 |
|---|---|---|---|
| Dividends | $396,719.75 | $398,419.86 | $385,881.00 |
| Interest | 920.85 | 2,252.19 | 10,566.38 |
| Long-term capital gains | 137,882.48 | 202,473.09 | 955,761.77 |
| Short-term capital gains | 71,978.55 | | 8,907.25 |
| Other income | | | 5,480.21 |
| Total income | 607,501.63 | 603,145.14 | 1,366,596.61 |
| Percent of total income from dividends | 65.30 | 66.06 | 28.24 |
| Percent of total income from capital gains | 34.54 | 33.57 | 70.59 |
| Percent of total income from dividends and capital gains | 99.84 | 99.63 | 98.83 |

*Golconda Investments in Silver Buckle and West Coast Engineering*

During the period here involved Golconda purchased interests in Silver Buckle Mining Co. (Silver Buckle) and West Coast Engineering Co. (West Coast). Silver Buckle was an old Idaho mining company with control of extensive landholdings in the Coeur d'Alene area, including a 50-percent interest in the Vindicator property adjacent to the Lucky Friday mine. In 1962 Golconda purchased 54,500 shares of Silver Buckle. In that same year Golconda decided to assist West Coast, which was a subsidiary of Silver Buckle, in financing the sales of certain leases obtained in the course of its archery lane business. Golconda agreed to guarantee West Coast's performance on these leases to a limit of $420,000, and pledged 20,000 shares of Lucky Friday as security. West Coast placed in escrow 1,999,998 shares of Silver Buckle and a direct pledge of all of Silver Buckle's assets to protect Golconda against loss. In 1963 Silver Buckle was merged into West Coast and a new subsidiary called Silver Buckle Mines, Inc., was created and all of its stock was pledged as security for Golconda. In 1964, in two separate transactions, Golconda was called upon to make payments under its guarantee totaling $95,094. Golconda took from escrow stocks of equivalent value, including 125,000 shares of Vindicator Silver-Lead Mines Co., some of which it sold and some of which it kept for investment.

In 1964 Magnuson informed Golconda's other directors that he and a group of other persons were advancing funds to satisfy the claims of the general creditors of West Coast. In 1965 Magnuson advised Golconda's directors that the company could be released from its remaining liability under its guaranty or it could assume his position as a new guarantor up to $100,000. Golconda's directors elected to terminate its remaining guaranty and not assume any new guaranty. During the course of these transactions not all of Golconda's directors were aware that Magnuson and Featherstone were shareholders of Silver Buckle in their individual capacities.

Although these transactions may have aided Magnuson in influencing or manipulating the prices of these stocks (see *Pennaluna & Co.* v.

*Securities and Exchange Commission*, 410 F. 2d 861 (C.A. 9, 1969)), Golconda ultimately obtained 125,000 shares of the stock of Vindicator Silver-Lead Mines upon West Coast's default and thus acquired an interest in yet another landholding company in the Golconda area of the Coeur d'Alene district.

*Golconda's Registration Under the Investment Company Act of 1940*

In March 1964 the Securities and Exchange Commission (SEC) contacted Golconda regarding its possible status as an investment company under section 3(a) of the Investment Company Act of 1940. Golconda initially applied for exemption on the ground that it was primarily engaged in a business other than investing. However, when Golconda learned that the SEC was prepared to reject its application, permission to withdraw the application was requested and was granted. Thereafter, on November 17, 1965, Golconda filed with the SEC a "Notification of Registration" as an investment company under and pursuant to the provisions of section 8(a) of the Investment Company Act of 1940. Golconda classified itself as a "Management Company."

In its annual report to shareholders for the year ended December 31, 1965, Golconda set forth the following:

Inasmuch as the market value of investments owned by Golconda, including the capital stock of Hecla Mining Company, exceeds 40% of the determinable value of all of its assets including mining properties, and since Golconda is not presently engaged directly in mining operations, Golconda was required, in November, 1965, to register under the provisions of the Investment Company Act of 1940.

Golconda also indicated in its registration statement filed May 3, 1966, with the SEC that it had no fixed policy with respect to portfolio turnover and that:

The Registrant's portfolio turnover will result from the Registrant's judgment of market conditions affecting its portfolio securities and determination of changes in the relative merits of available investment opportunities, particularly with respect to those securities which were acquired, and investment opportunities which may be exploited, with the reasonable likelihood of capital appreciation and long-term capital gains.

At this same time the SEC was also investigating Golconda's transactions in Hecla and Lucky Friday stock. On May 19, 1965, the SEC initiated civil proceedings against Golconda based on its transactions in those stocks prior to the execution of the merger agreement between Hecla and Lucky Friday in September 1963.

In 1969 Golconda consented to the entry of a judgment based upon allegations by the Securities and Exchange Commission that Golconda and Harry F. Magnuson as insiders in Hecla and Lucky Friday used inside information to effect transactions in the capital stock of Hecla and Lucky Friday in violation of section 10(b) of the Securities and

Exchange Act of 1934 and Rule 10B–5 of the SEC's regulations there-under. Golconda chose to not contest these SEC matters any longer, partly because of the time and expenses involved.

*Golconda's Officers and Directors and Their Respective Shareholdings, Dividends, and Salaries*

In 1959 Wray Featherstone became president of Golconda. He was a mining engineer who had spent his entire life in the Coeur d'Alene district. In 1956 he worked as a mining engineer at the Lucky Friday mine. He later became construction superintendent and then mine superintendent for Lucky Friday, as well as industrial engineer for Hecla's Star mine. As president of Golconda he worked only part time until October 1965 when he left Hecla to devote his full time to Golconda. His responsibilities at Golconda consisted of routine corporate activities and also included the locating of mining claims, conducting assessment work, maintenance of the property and mill, and reporting to the directors on the operations of Lucky Friday. Featherstone also served as a member of the board of directors of Golconda.

Between 1960 and 1968 the other officers of the company were Harry F. Magnuson, vice president, and Donald L. Hess, secretary-treasurer. The board of directors, in addition to Featherstone, consisted of Magnuson who had been a director since 1951, C. Ervin Bloom, retired superintendent at the Golconda mill and a director since 1949, Walter L. Sly, a carpenter and a director since 1952, and Carl L. Turner, a director since 1959 and president of Consolidated Coal & Stoker Co., and vice president of Johnson-Bungay Fuel Co., Spokane, Wash.

Magnuson, in addition to serving as an officer and director of Golconda, was the principal partner in the public accounting firm of H. F. Magnuson & Co. with offices in Wallace, Idaho, and served as an officer or director of numerous other business enterprises engaged in such fields as mining, banking, communications, real estate, securities brokerage, and publishing. He is a certified public accountant and holds a master's degree in business administration from the Harvard Business School.

Hess, who served as secretary-treasurer of Golconda, was a full-time employee of H. F. Magnuson & Co. Between 1960 and 1969, Featherstone, Magnuson, and Hess all held positions as officers and/or directors of numerous nonproductive mining companies in the Coeur d'Alene area which were controlled by Golconda.

After Golconda's mill was closed in 1960, and until October 1965, when Featherstone began to devote all of his time to the affairs of the company, no full-time employees were retained by the company. The

salaries of the officers and directors paid by Golconda from 1962 through 1967 were as follows:

| | 1962 | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|---|---|
| Wray Featherstone | $5,100 | $6,900 | $9,530 | $10,000 | $10,000 | $11,666 |
| H. F. Magnuson | 5,100 | 6,900 | 9,530 | 10,000 | 10,000 | 11,666 |
| D. L. Hess | 480 | 830 | 1,400 | 1,750 | 1,800 | 2,300 |
| C. E. Bloom (pension) | 900 | 900 | 1,050 | 1,200 | 1,200 | 1,700 |
| Walter L. Sly | | | | | | 1,000 |

H. F. Magnuson & Co. also received varying amounts for accounting work performed for Golconda. Pennaluna & Co., owned by H. F. Magnuson and Ben Harrison, was paid $22,158 in brokerage commissions in 1966 for securities transactions executed on behalf of Golconda.

Between 1962 and 1967 the number of Golconda's shareholders of record ranged from a low of 1,557 to a high of 2,944. The number of shares outstanding between 1962 and 1965 was 2 million. This number was reduced to 1,933,000 for 1966 and 1967. The stock was listed on the Spokane, Salt Lake City, Vancouver, B.C., and National Stock Exchanges.

The following schedules indicate the number of shares of Golconda stock owned by the officers and directors of the company and by the children and mother of Harry F. Magnuson as of December 31, 1962, through December 31, 1966:

| | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|---|---|---|
| C. E. Bloom | 3,000 | 3,000 | 3,000 | 3,000 | 2,000 | 2,000 | 2,000 |
| Dan Camp | | 3,000 | | | | | |
| Wray Featherstone | 20,000 | 21,000 | 21,000 | 33,300 | 33,300 | 33,500 | 28,700 |
| D. L. Hess | | | | | 2,000 | 2,000 | 2,000 |
| H. F. Magnuson | 119,200 | 128,700 | 110,500 | 147,825 | 151,325 | 156,475 | 157,975 |
| Walter L. Sly | 18,000 | 18,000 | 16,000 | 16,000 | 16,000 | 16,100 | 15,000 |
| Carl Turner and wife | 75,375 | 61,375 | 71,875 | 72,875 | 73,875 | 73,905 | 73,905 |
| Totals | 235,575 | 235,075 | 222,375 | 273,000 | 278,500 | 283,980 | 279,580 |

| | 1962 | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|---|
| H. F. Magnuson | 110,500 | 147,825 | 151,325 | 156,475 | 157,975 |
| H. F. Magnuson—Charitable Trust | 500 | 1,200 | 500 | 500 | |
| HFM custodian for— | | | | | |
| Harry James | | 2,000 | 2,100 | 5,412 | 7,987 |
| John F. | | | 600 | 3,600 | 5,600 |
| Kathleen Janet | | 2,000 | 2,100 | 5,414 | 7,989 |
| Mary Elizabeth | | 2,000 | 2,100 | 5,412 | 7,987 |
| Thomas Robert | | 2,000 | 2,100 | 5,412 | 7,987 |
| Mary C. Magnuson (mother) | 14,000 | 14,000 | 13,500 | 13,500 | 12,600 |
| Total | 125,000 | 171,025 | 174,325 | 195,725 | 208,125 |

Between December 31, 1961, and February 1, 1967, the officers and directors of Golconda owned "of record and beneficially" from 11 to

16.46 percent of the corporation's outstanding capital stock. Harry F. Magnuson, during this same period, owned "of record and beneficially" from 5.5 to 10.12 percent of the corporation's outstanding capital stock.

From 1957 to 1969 proxies were solicited by or on behalf of the incumbent management of Golconda for use at the annual meeting of shareholders. All proxies so solicited appointed Wray Featherstone and H. F. Magnuson as "attorney and proxy." In 1960 and through 1969 Golconda had cumulative voting.

Harry F. Magnuson, from 1960 to 1968, when he disposed of his interest in Golconda, was the major force in the management of the company and influenced all of the company's investment decisions during such period. Magnuson assumed this leadership role as a result of his dominant personality as well as through his positions as an officer, director, and major shareholder of Golconda. His large stock interest in the company, standing alone, provided him with a significant voice in the operation of Golconda.

Magnuson was not, however, the only major shareholder of record during all of the years involved in this proceeding. David A. Noyes & Co., a Chicago securities brokerage house, held as many as 204,875 shares of Golconda in 1965. Between 1961 and 1963, Noyes & Co. held from 75,300 to 178,000 shares of Golconda. William L. Graham, Jr., of that company was responsible for that firm's holdings in Golconda and he advised Golconda that he controlled 440,000 shares of its stock. Graham called Magnuson frequently concerning the conduct of Golconda. In 1966 Graham became unhappy with Golconda's management and began to liquidate his company's holdings. To maintain the price of Golconda's stock and to reduce the number of shares Hecla would have to issue in the event of a merger, Golconda acquired 67,000 shares of its own stock at a cost of $485,600.

### Golconda's Earnings and Dividend Policy

In 1957, when Golconda's directors first authorized payment of a dividend, they desired to establish a policy which would be continuous. It was believed that for a mining company to continue in existence it should acquire other ore bodies, participate in exploration ventures, or acquire stock in other mining companies. Golconda's directors were also very much aware of the difficulties of a land-owning mining company without the resources to develop its properties.

In formulating Golconda's dividend policy the directors were concerned with maintaining the dividend payments, keeping sufficient working capital on hand, and reducing the company's debt. Although this debt was incurred in connection with the acquisition of additional

marketable securities, it is not an uncommon practice for mining companies to secure interests in other mining companies..

Golconda's earnings and dividends per share and net income, dividends paid, and retained earnings for the years 1957 through 1966 were as follows:

| Year | Earnings per share [1] | Dividends per share | Net income | Dividend paid | Retained earnings |
|------|------|------|------|------|------|
| 1957 | 0.045 | 0.02 | $90,011 | $40,000 | ($128,444) |
| 1958 | .05 | .02 | 106,686 | 40,000 | (124,095) |
| 1959 | .044 | .02 | 87,142 | 40,000 | (76,953) |
| 1960 | .046 | .02 | 92,740 | 40,000 | (24,213) |
| 1961 | .093 | .02 | 185,464 | 40,000 | 121,251 |
| 1962 | .262 | .04 | [2] 523,972 | 80,000 | 565,223 |
| 1963 | .254 | .04 | [3] 507,935 | 80,000 | 993,158 |
| 1964 | .24 | .05 | 477,689 | 100,000 | 1,370,847 |
| 1965 | .20 | .07 | 408,662 | 140,000 | 1,639,509 |
| 1966 | .52 | .09 | [4] 1,000,523 | 176,490 | 2,463,542 |

[1] Net income per share before capital gains and income taxes for 1962 through 1966 was .089, .107, .155, .158, and .15, respectively.
[2] Includes capital gain of $350,429, after taxes, resulting from sale of 14,600 shares of Lucky Friday capital stock.
[3] Includes capital gain of $95,394, after taxes, resulting from sale of 4,500 shares of Lucky Friday capital stock.
[4] Includes capital gain of $707,109, after taxes, resulting from sale of 43,410 shares of Bunker Hill capital stock.

The approximate fair market value of Golconda's assets less liabilities as of December 31 for the years 1961 through 1966 was as follows:

| Year | Investments at cost | Approximate market value | Less accounts payable | Less income taxes payable | Less notes payable | Net FMV less liabilities |
|------|------|------|------|------|------|------|
| 1961 | $518,859 | $4,865,000 | $12,883 | $12,668 | $30,000 | $4,809,449 |
| 1962 | 1,300,789 | 5,840,000 | 3,679 | 122,811 | 251,000 | 5,462,510 |
| 1963 | 2,153,769 | 7,650,000 | 48,287 | 93,607 | 695,000 | 6,813,106 |
| 1964 | 3,029,924 | 12,950,000 | 163,973 | 36,821 | 1,140,000 | 11,609,206 |
| 1965 | 2,888,298 | 10,425,300 | 181,742 | 53,056 | 720,000 | 9,470,502 |
| 1966 | 3,127,895 | 15,584,000 | 47,536 | 253,220 | 550,000 | 14,733,244 |

As a result of Golconda's failure to distribute all current earnings and profits for the years 1962 through 1966 the following shareholders (members of the company's board of directors) avoided the payment of additional individual income taxes as shown below:

| Year | Magnuson [1] | Featherstone | Turner | Sly |
|------|------|------|------|------|
| 1962 | $13,330.48 | $1,361.96 | $5,786.62 | $507.55 |
| 1963 | 5,457.01 | 1,731.94 | 5,401.94 | 708.19 |
| 1964 | 11,517.21 | 1,287.55 | 4,302.10 | 469.70 |
| 1965 | 13,024.22 | 1,031.65 | 3,689.71 | 376.26 |
| 1966 | 25,900.74 | 3,042.23 | 11,197.95 | 1,153.97 |
| Totals | 69,229.66 | 8,455.33 | 30,378.32 | 3,215.67 |

[1] These figures do not include the tax avoided by members of Magnuson's family if all current earnings were distributed.

Shortly before the trial of this case, Donald L. Hess, Golconda's secretary-treasurer during the years in issue, prepared an analysis of

the net liquid assets of Golconda available for distribution as dividends on December 31 of each of the years 1962–66. This exhibit is divided into five segments with separate computations for each of the years in issue. The first segment lists "Basic business assets not reasonably available for liquidation for payment of debts, business needs or dividends." Included in this segment are (a) property, plant, and equipment, (b) Lucky Friday stock, at cost, (c) Hecla stock, at cost, and (d) stock of Golconda area companies held for property interests, at cost. The second segment is entitled "Assets available for payment of debts, reasonable business needs, and dividends." Under this heading are (a) current assets, (b) Bunker Hill stock, market value, (c) miscellaneous stocks, market value, and (d) less, applicable taxes on gain of stock sold. The third major section is entitled "Liabilities" and is expressed by a single total figure. The fourth segment is entitled "Amounts needed for reasonable business needs." This segment includes (a) acquisition of land or companies on Golconda area, (b) estimated cost of deep exploration, (c) estimated cost of production facilities if exploration successful, (d) guarantee of West Coast Engineering, (e) geologic study of Golconda area, (f) reserve for cost of SEC investigation of investment company status and Hecla-Lucky Friday merger matter, (g) diamond drilling, (h) reserve for 1962–65 tax deficiencies, and (i) reserve for contesting tax deficiencies. The computations by Mr. Hess attempt to show petitioner had a deficit in liquid assets available for distribution as dividends of from approximately $3,700,000 to $4,250,000 during the period 1962–66.

### ULTIMATE FINDINGS

1. For the years 1962 through 1965 petitioner did not accumulate its earnings and profits beyond the reasonable needs of its business.

2. For the year 1966 petitioner has failed to prove by a preponderance of the evidence that one of the purposes for the accumulation of its earnings and profits was not the avoidance of income tax with respect to its shareholders and is therefore subject to the accumulated-earnings tax determined by respondent for that year.

### OPINION

The threshold question presented by the parties for decision is whether the accumulated-earnings tax may be imposed upon a "publicly held" corporation. Although sections 531 and 532 specifically apply to "every corporation," other than those described in section 532(b), petitioner contends that in enacting sections 531 through 537 of the Internal Revenue Code of 1954, Congress also intended to except publicly held corporations from such tax. In support of its position pe-

titioner points out that section 532 of H.R. 8300, which was ultimately enacted into law as the Internal Revenue Code of 1954, originally contained a provision excepting any corporation with more than 1,500 shareholders and no more than 10 percent of the stock held by any individual (including members of his family),[2] from the accumulated-earnings tax. Petitioner further stresses that although this provision was deleted from the final version of section 532, the Senate report [3] indicates this action was taken because of the difficulty faced by generally recognized "publicly held" companies in establishing that not more than 10 percent of its stock is held by any individual and members of his family. The Senate report also discloses that since this tax is not in practice applied to publicly held corporations, the committee thought it desirable to remove the exemption provided in the House bill.

Nevertheless, this same Senate report clearly indicates this action was taken by the Senate with full knowledge that the accumulated-earnings tax was *theoretically* applicable to publicly held, as well as closely held, companies without the specific exemption proposed by the House.[4] Accordingly, we conclude as a matter of law that the accumulated-earnings tax can apply to publicly held corporations.[5] We are mindful, however, that the imposition of this tax upon a publicly held company should only occur where the fact of public ownership is neutralized by the manner in which the company has been managed. If the management group is dominated by a single large shareholder or a small group of large shareholders who exercise effective control over the dividend policy of the company [6] or the company represents itself to prospective or existing shareholders as an investment company with the avowed policy of accumulating its investment income,[7] public ownership of the company becomes a less important factor in determining whether earnings and profits have been accumulated for the proscribed purpose.[8] Thus, the mere fact that petitioner had from 1,500 to 2,900 shareholders during the years in issue and petitioner's management group owned or controlled no more than approximately 12 to 17 percent of its issued and outstanding stock cannot preclude per se further inquiry into whether the

[2] H. Rept. No. 1337, 83d Cong., 2d Sess., p. 172 (1954).

[3] S. Rept. No. 1622, 83d Cong., 2d Sess., p. 68 (1954).

[4] S. Rept. No. 1622, 83d Cong., 2d Sess., p. 68 (1954).

[5] See Surrey & Warren, Cases and Materials on Federal Income Taxation, 1397, 1398 (1960).

[6] Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.02, pp. 8–5, 8–6 (3d ed. 1971).

[7] Id. at par 8.08, p. 8–30.

[8] It has even been suggested that publicly held "growth" stock companies are motivated to accumulate surplus to facilitate realization of low-taxed capital gains at least as much as the managements of family-held corporations. Simons, "The Gathering Storm of Section 531 of Our Tax Law," 44 Taxes 528, 529 (1966).

facts disclosed in this proceeding dictate that the accumulated-earnings tax be imposed upon petitioner for any of the years involved herein.[9]

Next we consider respondent's contention that Golconda was a mere holding or investment company within the meaning of section 533(b)[10] and section 1.533–1(c)[11] of the Income Tax Regulations. This issue turns upon the facts and circumstances of each case. *Commissioner* v. *Cecil B. DeMille Productions*, 90 F.2d 12 (C.A. 9, 1937), affirming 31 B.T.A. 1161 (1935), certiorari denied 302 U.S. 712 (1937); *Beim Co.* v. *Landy*, 113 F.2d 897 (C.A. 8, 1940); *Dahlem Foundation, Inc.*, 54 T.C. 1566 (1970), acq. 1971–2 C.B. 2. The evidence adduced in this case leaves us with little doubt that petitioner was primarily[12] a holding and investment company. But, as we stated in *Olin Corporation*, 42 B.T.A. 1203 (1940), affd. 128 F.2d 185 (C.A. 7, 1942), being primarily a holding and investment company is not the same as being a mere holding or investment company within the terms of the statute.[13] Although respondent makes a vigorous and appealing argument on this point, we think petitioner has established that its efforts in attempting to unitize the properties to the east of the Golconda property for the purpose of commencing a deep-exploration program constituted a bona fide business activity. Petitioner not only maintained the mining claims on these properties, but also located almost 50 new claims. Furthermore, petitioner assumed certain obliga-

---

[9] See *Trico Products Corporation*, 46 B.T.A. 346 (1942), affd. 137 F.2d 424 (C.A. 2, 1943), certiorari denied 320 U.S. 799 (1943), and *Trico Products Corp.* v. *McGowan*, 67 F. Supp. 311 (W.D.N.Y. 1946), affd. 169 F.2d 348 (C.A. 2, 1948), certiorari denied 335 U.S. 899 (1948), which are cases involving the imposition of the accumulated-earnings tax upon a publicly held company and are analogous to the instant case in that regard. See also Mertens, Law of Federal Income Taxation, sec. 39.54, p. 110 (Malone rev. 1967).

[10] SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(b) HOLDING OR INVESTMENT COMPANY.—The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders.

[11] Sec. 1.533–1(c) *Holding or investment company*. A corporation having practically no activities except holding property and collecting the income therefrom or investing therein shall be considered a holding company within the meaning of section 533(b). If the activities further include, or consist substantially of, buying and selling stocks, securities, real estate, or other investment property (whether upon an outright or marginal basis) so that the income is derived not only from the investment yield but also from profits upon market fluctuations, the corporation shall be considered an investment company within the meaning of section 533(b).

[12] As respondent indicates, petitioner's formal registration with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, 15 U.S.C. secs. 80a–1—80a–52, is an acknowledgment that petitioner was an investment company during the years here at issue. Additionally, the facts that petitioner actively engaged in trading certain securities in its investment portfolio on margin, making both long and short purchases and sales, and that in excess of 90 percent of its assets during these years were investment securities, tend to support the conclusion that petitioner was *primarily* a holding and investment company during such period.

[13] It has been noted that the regulations assume every holding or investment company is automatically a "mere" holding or investment company within the meaning of sec. 533(b). Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, fn. 60, par. 8.08, p. 8–30. See *Industrial Bankers Securities Corporation* v. *Higgins*, 104 F.2d 177 (C.A. 2, 1939).

tions in purchasing the stocks of mining companies with properties adjacent to the Golconda property. In its contracts with Mullan Metals and Ivanhoe Mining the petitioner agreed to cause geological surveys of the properties to be made and, in the case of Ivanhoe, agreed to work on a diamond-drilling program on the Ivanhoe property and to arrange Ivanhoe's corporate records in proper order. While these activities were undertaken in connection with petitioner's acquisitions of adjacent properties and were related to the protection of its real estate investments, they were still an integral part of the unitization program and cannot be cavalierly dismissed, as respondent suggests, as simply a necessary part of petitioner's investment program. These were in the nature of business activities despite the fact they did not require day-to-day participation by the corporate officers or employees. Hence we conclude that the petitioner was not a mere holding company within the meaning of section 533(b). See *Nemours Corporation*, 38 T.C. 585, 601 (1962), affirmed per curiam 325 F.2d 559 (C.A. 3, 1963), and *Dahlem Foundation, Inc., supra* at 1576.[14]

Alternatively, respondent argues that even if petitioner is not found to be a "mere holding or investment company," petitioner should be subject to the accumulated-earnings tax under the provisions of sections 532(a)[15] and 533(a)[16] since its earnings and profits have been permitted to accumulate beyond the reasonable needs of its business. He also argues that the petitioner has failed to prove by the preponderance of the evidence that this accumulation was not for the purpose of avoiding the income tax with respect to certain of its shareholders.

Whether petitioner has permitted its earnings and profits to accumulate beyond the reasonable needs of its business and was availed of for the purpose of avoiding the income tax with respect to certain of its shareholders are questions of fact. *Helvering* v. *Nat. Grocery Co.*, 304 U.S. 282 (1938) ; *Estate of Goodall* v. *Commissioner*, 391 F.2d 775, 796 (C.A. 8, 1968), modifying a Memorandum Opinion of this Court; *Bremerton Sun Publishing Co.*, 44 T.C. 566, 582 (1965), appeal dismissed (C.A. 9, January 1966) ; *Faber Cement Block Co.*, 50 T.C. 317,

---

[14] See also *Charles Turner*, T.C. Memo. 1965-101, appeal dismissed (C.A. 9, September 1965).

[15] SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

[16] SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

327 (1968), acq. 1968-2 C.B. 2. In making this factual analysis it is necessary to determine whether prior accumulations of earnings were sufficient to meet the reasonable needs and reasonably anticipated needs of petitioner's business during the years 1962 through 1966. Secs. 1.535-3 (b) (1) (ii), 1.537-1, 1.537-2, 1.537-3, Income Tax Regs. It is also necessary to consider the nature of the surplus and whether the accumulation of earnings is reflected in liquid assets with a value in excess of the immediate or reasonably anticipated needs of petitioner's business. *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F.2d 495, 501 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976 (1960).

In passing upon the reasonableness of petitioner's prior accumulated earnings as well as its retained earnings for the years 1962 through 1966, we are reluctant to substitute our business judgment for that of petitioner's management unless the facts and circumstances of record and the presumptive correctness of respondent's determination impel us to do so. *Faber Cement Block Co., supra* at 329; *Bremerton Sun Publishing Co., supra* at 583; *Breitfeller Sales, Inc.*, 28 T.C. 1164, 1168 (1957), acq. 1958-2 C.B. 4.

Petitioner asserts that it was necessary to retain the bulk of its earnings and profits to (1) acquire property in the Golconda area for the purpose of conducting a major exploration program at some depth, in which petitioner would participate, and (2) protect its interest in the Lucky Friday mine. To accomplish these objectives the petitioner believed it would need approximately $1 million to acquire the land or stock in the companies owning the land necessary to justify a major exploration project. Petitioner also believed it should have funds available to finance the annual assessment work required on the properties, the diamond drilling needed, and the geological survey work necessary to warrant undertaking the contemplated exploration program. Petitioner further claims it needed the resources to actually carry out this program so it could undertake the program itself or obtain a higher percentage of the profits in any joint exploration program ultimately negotiated because of its ability to participate in the financing.

The second ground advanced by petitioner for retaining its earnings is that to protect its interest in Lucky Friday, after Hecla assumed control over Lucky Friday, it was incumbent upon petitioner to purchase Hecla stock so that it could exert more influence over Hecla's policies concerning Lucky Friday.

Respondent makes a wide-scale frontal assault upon petitioner's primary reasons supporting its accumulation of earnings. First, he contends petitioner had no specific, definite, and feasible plans for a

deep-exploration project in the eastern part of the Coeur d'Alene district until 1965.[17] At that date, it is argued, the plan was only specific in regard to acquiring the land and made no provision for the actual exploration. Respondent adds that petitioner's officers even acknowledged they did not intend to have Golconda finance the exploration entirely out of its own funds and their energies were largely directed toward locating a major active mining company to finance and carry out the exploration program.

In response to petitioner's claim that it continued to increase its Hecla stock holdings for the purpose of protecting its interest in Lucky Friday, respondent points out that Golconda never gained control of Hecla through these purchases and that such purchases were not required to effectuate the consolidation of the area later unitized in the Alice project. Respondent also argues that neither were such purchases necessary to bring Hecla to terms in participating in this project. After Hecla acquired control of Lucky Friday, respondent points out, expansion and improvement activities were continued and Lucky Friday dividend distributions were increased. Respondent also notes that petitioner continued to acquire Hecla stock because it was a good investment and traded in it regularly, making numerous purchases and sales as market conditions created a favorable climate for profit taking and repurchases. Similarly, respondent charges that Golconda made these purchases to obtain leverage in promoting a merger with Hecla on a basis highly favorable to the shareholders of Golconda. Respondent's arguments pertaining to the reasonableness of the accumulation of petitioner's earnings conclude with the charges that petitioner's loan transactions with West Coast Engineering and purchase of 67,000 shares of its own stock in 1966 are indicia that earnings were accumulated beyond the reasonable needs of its business.

Contrary to respondent's allegations, the record in this case is replete with evidence supporting Golconda's claim that as early as 1959 consolidation of the properties in the eastern part of the Coeur d'Alene area for a major exploration program was contemplated. Golconda's annual reports to shareholders for the years 1959 through 1966 each contain specific statements with regard to such plans. In fact, each report indicates the increasing interests in the surrounding properties acquired by Golconda during each year through purchases of stock in the landholding companies, purchases of patented mining claims, and purchases of mineral rights.

These reports also include statements in 1961 and 1962 that an exploration program is possible if and when metal prices improve. In

---

[17] See sec. 1.537–1(b)(1), Income Tax Regs.

1963, Golconda disclosed that plans for a comprehensive examination by independent geological consultants were being formulated and the 10-year downtrend in lead and zinc prices had been reversed while the consumption of silver continued to greatly exceed production. The 1964 report states Shenon & Full, independent geological consultants, submitted a report recommending two exploration projects. It also indicates the company is hopeful that the necessary steps leading to the exploration and development of the Golconda area can be taken. The 1965 and 1966 reports reiterate this general theme and contain a discussion of H.R. 4665 (ultimately adopted as Pub. L. 89–570 (Sept. 12, 1966) adding section 617 to the Internal Revenue Code of 1954), which provides for the deduction of all exploration expenses currently. Golconda viewed this as a favorable development in its bid to implement its contemplated exploration program. These reports also discuss the diamond drilling and other exploratory work carried out by petitioner in the unitized area.

In addition to the information contained in these annual reports, there is correspondence between Golconda and Hecla concerning a major exploration program to be carried out by these companies during the period in issue and there is also testimony by Featherstone and Randall concerning such an undertaking. Finally, although by no means determinative, there is the objective fact that in 1969 Hecla and Golconda entered into a preliminary agreement for the joint exploration of the Golconda area [18] and this program is now in the process of being implemented. Therefore, we are persuaded that the accumulation of funds for these purposes was to enable specific, definite, and feasible plans to be carried out. See and compare *Templeton Coal Co.* v. *United States*, 301 F. Supp. 592 (S.D. Ind. 1969).

Petitioner claims that it needed a minimum of at least $2 million to finance the actual exploration and $1,500,000 to finance the cost of production facilities in the event the project proved successful. Since petitioner's directors concluded as early as 1959 that Golconda should not undertake the entire financial burden or risk of a major exploration project, we think the minimum sums estimated by petitioner to be necessary to finance the entire project did not constitute a reasonable or reasonably anticipated need of petitioner's business operation. On the other hand, we think a fairly substantial portion of this amount was necessary to permit Golconda to participate in such a program on a relatively favorable basis. Accordingly, it is our conclusion that

[18] The consummation at a later date of plans petitioner claims it intended to carry out and was accumulating its income for during the years in issue does give added weight to its assertions. *Dixie, Inc.* v. *Commissioner*, 277 F.2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958) ; *Faber Cement Block Co.*, 50 T.C. at 333 ; sec. 1.537–1(b)(2), Income Tax Regs.

$2,500,000 was a reasonable sum to have available to cover any costs petitioner might be obligated to bear in connection with its participation in an exploration and development program of the Golconda area.

In our judgment such sum amply fulfilled petitioner's need for the wherewithal to finance a portion of such a project and permitted petitioner to maintain a strong bargaining stance in attempting to negotiate with major operating mining companies for a substantial portion of the anticipated profits. Without such a fund the petitioner could have been severely disadvantaged. If exploration and development of the area was to be effected, petitioner would have been forced to swallow the terms proposed by the operating companies who would undoubtedly have demanded the lion's share of the anticipated profits since they would be assuming virtually all of the risks involved. Yet this sum is not the full amount of funding necessary to finance the entire project since, as noted earlier, petitioner at no time based on the evidence presented, intended to finance this venture by itself.

In addition to the funds needed for the exploration project, petitioner had other business needs during the years 1962 through 1966. These needs were summarized in an exhibit prepared shortly before the trial of this case, by petitioner's secretary-treasurer during the years in issue, Donald Hess. The business needs enumerated in this exhibit, other than funding for the exploration project, consisted of funds needed to acquire properties desirable for exploration or stock in the companies owning such properties in the Golconda area, the potential liability of petitioner under its guarantee of certain obligations of West Coast Engineering, the cost of the geological study of the property to be explored, a reserve for the cost of contesting various matters being investigated by the Securities and Exchange Commission, the cost of certain diamond drilling to be done, a reserve for the payment of asserted Federal income tax deficiencies, and a reserve for the cost of contesting this Federal income tax case. We are satisfied that these items constituted reasonable or reasonably anticipated needs of petitioner's business during the period in issue.

However, we cannot conclude at this point. We must determine whether the nature and availability of petitioner's liquid assets made further accumulations of earnings and profits unreasonable during these years. *Smoot Sand & Gravel Corporation* v. *Commissioner*, *supra* at 501. During the period 1962 through 1966 the petitioner held investment assets broken down as follows:

|  | 1962 | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|---|
| Fair market value of Golconda's total investment assets | $5,840,000 | $7,650,000 | $12,950,000 | $10,425,300 | $15,584,000 |
| Fair market value of Golconda's holdings in Lucky Friday and Hecla stock later received in exchange (approximately 230,000 Hecla shares) [1] | 4,212,000 | 4,314,000 | 7,648,000 | 6,296,000 | 9,890,000 |
| Fair market value of Golconda's interests in companies holding land in eastern part of Coeur d'Alene District [2] | 171,300 | 204,875 | 704,400 | 698,866 | 1,087,452 |
| Liabilities | 388,000 | 849,000 | 1,341,000 | 955,000 | 851,000 |
| Investment assets currently available for dividend distributions | 1,068,700 | 2,282,125 | 3,256,600 | 2,475,434 | 3,755,548 |
| Total estimated reasonable business needs | 3,377,000 | 3,312,000 | 3,396,500 | 3,191,000 | 3,150,000 |

[1] Respondent argues that Golconda's Lucky Friday holdings and 230,000 shares of Hecla stock into which it was later converted should be considered a current asset. Until 1959 Lucky Friday was a related, controlled company and Golconda's investment in Lucky Friday was unquestionably related to the active conduct of Golconda's business, supplying Golconda with the bulk of its annual income. The failure to liquidate this interest after Hecla assumed control or after this interest was converted into Hecla stock did not constitute an investment decision by the officers and directors of Golconda. The decision to retain this interest, in whatever form necessary, was merely a decision to maintain the status quo. See and compare *John P. Scripps Newspapers*, 44 T.C. 453, 472 (1965), where an investment in preferred stock for the purpose of using the income therefrom to fund its employee profit-sharing plan was held not to be a current asset.
[2] Golconda's interests in these companies obviously did not constitute liquid assets since the entire investment made in these companies was for the purpose of consolidating the area for exploration.

From the foregoing chart it is apparent that in 1966 petitioner possessed current investment assets with a value of nearly $600,000 in excess of its liabilities and reasonable business needs, as determined herein. In 1966, Golconda paid out a total of $176,490 in dividends to its shareholders while realizing in excess of $955,000 in long-term capital gains and dividend income of over $385,000. In this same year Golconda expended $485,600 for the acquisition of 67,000 shares of its own stock, primarily to reduce the number of shares which would have been required to be issued by Hecla in connection with the contemplated, much-discussed, merger between these two companies. It is clear in the instant case that the major benefit of this merger was to the shareholders of Golconda who would be exchanging their ownership rights in a relatively small, nonoperating, mining company for an interest in one of the leading mining companies in the United States. The benefit to Golconda, on the other hand, by way of improved business operations, economies achieved through consolidation of production facilities or markets, or increased sales was nil since it was a nonoperating company whose chief asset was its stock in Hecla. Thus, the acquisition of its own stock was not made by Golconda pursuant to its business requirements and in fact serves as evidence of a surplus of funds.

As our findings of fact indicate, Golconda's management was dominated [19] by Harry F. Magnuson during the period in issue as a result

[19] See also *Pennaluna & Co.* v. *Securities and Exchange Commission*, 410 F.2d 861, 866 (C.A. 9, 1969), in this regard.

of his personality, his position as an officer and director, and his active role as the largest individual shareholder of the company. As a corporate executive and certified public accountant, Magnuson demonstrated his expertise in the tax area and concern for minimizing taxes when he caused Golconda to sell its Lucky Friday stock against the box to reduce the capital gains tax that would be incurred in these transactions. In 1966 Magnuson personally avoided the imposition of nearly $26,000 in additional Federal income taxes through Golconda's decision not to distribute all of its earnings and profits for the year. Carl Turner, another of Golconda's directors, avoided the payment of more than $11,000 in additional Federal income taxes as a result of the same corporate action in 1966. Based on the record as a whole, it is our conclusion that petitioner accumulated a portion of its earnings and profits beyond the reasonable needs of its business in 1966.[20] This fact is determinative of the purpose to avoid the income tax with respect to its shareholders unless petitioner can prove to the contrary by a preponderance of the evidence. Sec. 533; *United States* v. *Donruss Co.*, 393 U.S. 297 (1969). Petitioner has failed to prove that one of the purposes of its accumulation of earnings and profits in 1966 was not the avoidance of income tax with respect to its shareholders and is therefore subject to the accumulated-earnings tax determined by the respondent for that year.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[20] Petitioner asserts that the overhanging cloud of personal liability on the part of its directors for any accumulated-earnings tax liability caused them to set dividend policies without regard to any personal tax benefit. It appears to us, as with its other actions, a calculated risk was taken. Under Magnuson's leadership Golconda's directors were led to approve a loan guarantee transaction without knowledge of his personal involvement in the affairs of the debtor and were led to authorize securities transactions carried out without regard to any corporate or personal liabilities arising therefrom. Also, Magnuson caused his own Pennaluna & Co. to execute securities transactions for Golconda with seeming indifference to any unfavorable consequences.