## TECHNALYSIS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3238–91.  Filed November 4, 1993.

*Frank J. Walz* and *Steven R. Kruger,* for petitioner.
*Gail K. Gibson,* for respondent.

GERBER, *Judge:* Respondent, by means of a statutory notice of deficiency, determined Federal income tax deficiencies for petitioner's 1986, 1987, and 1988 taxable years in the amounts of $272,691.92, $367,756.68, and $449,840, respectively. Respondent, however, conceded that the maximum deficiencies for 1987 and 1988 are not in excess of $361,417.05 and $335,156.36, respectively. The deficiencies are attributable to respondent's determination that petitioner is subject to the accumulated earnings tax imposed by section 531.[1]

The issues for consideration are: (1) Whether the accumulated earnings tax can be applied to a widely held public corporation; (2) whether petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of the business; and (3) whether petitioner was formed or availed of for the proscribed purpose of avoiding income tax with respect to its shareholders.

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. When the petition was filed, petitioner's principal place of business was Minneapolis, Minnesota.

### Background

Victor Rocchio (Rocchio) began his career as a computer programmer for Univac in 1956. He left Univac in 1962 to work for Aries Corp., a programming services business started by a colleague from Univac. Rocchio began as a programmer at Aries, and after 2½ years he also became a member of the board of directors. During his last 2 years at Aries, he was manager of the Minneapolis office and a vice president of the company. Rocchio left Aries in 1967 because control of the company switched to the Washington, D.C., office and also because he did not agree with the company's management philosophy. Rocchio's background and experience were principally technical, and he was not as sophisticated regarding business and tax matters.

In 1967, Rocchio and six other similarly oriented individuals from Aries incorporated petitioner (hereinafter sometimes referred to as Technalysis) in Minnesota as a private corporation. Technalysis began operation on January 2, 1968. During October 1968, Technalysis issued 100,000 shares of stock at $2.50 a share through an initial public offering. Technalysis' initial capital was raised from the sale of shares to its incorporators. Technalysis also made shares available to the general public to raise additional working capital. No leveraged financing or similar means of raising capital was used other than the sales of shares of Technalysis stock.

During the years in issue, petitioner's shares were listed on the National Market System of the over-the-counter market. Approximately 1,500 shareholders held petitioner's stock during the years in issue. There were 1,606,208, 1,635,018, and 1,591,543 shares outstanding as of December 31, 1986, December 31, 1987, and December 31, 1988, respectively.

### Nature of Petitioner's Business

Technalysis is a computer programming services business. Technalysis provides programmers to government agencies

and commercial companies at an hourly rate. This is a highly competitive and volatile business. The programming consulting services are provided primarily at the customer's location. Technalysis also developed computer software programs for general use to sell to customers. The percentage of petitioner's gross revenue derived from programming service fees was approximately 86 percent, 90 percent, and 89 percent for the taxable years 1986, 1987, and 1988, respectively. The percentage of petitioner's gross revenue derived from the sale of software was approximately 12 percent, 8 percent, and 8 percent for the taxable years 1986, 1987, and 1988, respectively.

Technalysis' business was personnel-intensive. Qualified professionally skilled labor is the most important element in the operation of this type of business. Programmers were hired on a full-time basis, not on a temporary basis. Part-time programmers were not generally utilized because qualified part-time programmers were not always available. Technalysis would hire qualified programmers whenever it found them, whether or not there was an immediate need for their services. Programmers were considered "on the bench" when they were not currently working on a contract and were waiting for their next assignment. Technalysis' policy was to keep employees through slow times and during periods when they were on the bench. Employee turnover at Technalysis was minimal, and significant layoffs were not experienced. Petitioner had approximately 185, 227, and 250 employees at the end of the years 1986, 1987, and 1988, respectively. Petitioner's salary expense (exclusive of officers' compensation) for 1986, 1987, and 1988 was $1,866,261, $1,855,496, and $2,351,037, respectively.

Technalysis' management philosophy was extremely conservative. Rocchio did not believe in taking risks. While Rocchio was president, Technalysis had no long-term debt. There was short-term debt its first year of operation, but none since then. Technalysis has financed all its growth through the sale of shares and internally generated cash. Even though Technalysis' business expanded throughout the period under consideration and several additional geographical locations were opened, no debt was incurred or leveraging used. Petitioner's accumulated earnings and profits were

$5,346,888, $6,082,042, and $7,062,764 at the end of the years 1986, 1987, and 1988, respectively.

*Petitioner's Officers and Directors*

Rocchio has been president and a member of the board of directors since the company was incorporated and throughout the years in issue. Edward Zimmer (Zimmer), Robert Erickson (Erickson), and Archibald Spencer (Spencer), three of the four original members of the board of directors, were outside directors of Technalysis throughout the years in issue. During May 1988, Technalysis' shareholders voted to add a fifth member to the board of directors. Milan Elton (Elton), an employee of Technalysis from the beginning, became the fifth member of Technalysis' board of directors in 1988 at a time when he was a vice president and the secretary/controller of Technalysis.

Rocchio was the largest shareholder during the years in issue, holding between 17 percent and 17.7 percent of the outstanding shares. The second largest shareholder was a mutual fund, which held between 12.3 percent and 13.25 percent of the outstanding shares. The mutual fund did not send a representative to any shareholder meetings and made contact with Technalysis' officers only on a few occasions.

During 1986, 1987, and 1988, the board members other than Elton collectively owned approximately 25 percent of the outstanding shares of Technalysis, as follows:

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Rocchio | 17.0% | 17.5% | 17.7% |
| Spencer [1] | .4 | .3 | .3 |
| Erickson | 4.5 | 4.5 | 4.5 |
| Zimmer | 2.8 | 2.7 | 2.7 |
|  | 24.7 | 25.0 | 25.2 |

[1] The parties' stipulation states that Spencer owned .04 percent in 1986, .04 percent in 1987, and .03 percent in 1988. Evidence presented at trial, however, indicates that Spencer owned .4 percent in 1986, .3 percent in 1987, and .3 percent in 1988. We will use the ownership percentages presented at trial and note that the difference does not affect the outcome.

Elton owned approximately 4 percent to 4.5 percent of the outstanding shares of Technalysis during the years in issue.

For the years in issue, Rocchio was president of Technalysis, Elton was vice president/administration and controller, and James Clark (Clark) was vice president/services. In 1986, Spencer was the secretary, but for 1987 and 1988 Elton was the secretary. Total compensation for the officers was as follows:

|         | 1986      | 1987      | 1988      |
| ------- | --------- | --------- | --------- |
| Rocchio | $186,855  | $260,500  | $293,665  |
| Elton   | 90,000    | 131,267   | 153,390   |
| Clark   | 98,500    | 134,940   | 149,001   |

Petitioner did not make any loans to any shareholders, including the officers and directors, during the years in issue. Petitioner did not permit perks, such as cars, club memberships, or first-class travel, to its officers or directors. Overall, Technalysis' board and officers were unusually conservative in all respects and did not consider sophisticated tax aspects or other approaches to maximize a return for their shareholders' investment. The board did not maintain detailed minutes of their meetings and/or detailed plans for the corporation's "reasonable needs". In line with the board's and officers' lack of business and tax sophistication, no specialized tax advice was sought with respect to Technalysis' accumulated earnings.

*Dividends*

Technalysis paid its first dividend in 1972 and has paid a dividend every year since that time. Cash dividends approximated 30 percent of current earnings. Essentially, the dividend policy was set by Rocchio based upon his view that the shareholders should be kept happy in case additional capital was needed. He set this policy even though he was aware that other similar businesses generally did not pay dividends. Petitioner paid dividends of $322,082 (20 cents per share), $405,102 (25 cents per share), and $557,981 (35 cents per share) for 1986, 1987, and 1988, respectively. The dividends were declared in December 1986, 1987, and 1988 and were payable during February of 1987, 1988, and 1989, respectively. An Investor's Daily survey of 400 computer companies dated January 21, 1988, showed that of the 400 computer companies surveyed only 41 paid any dividends for

the preceding year. Technalysis' directors believed that for a "high tech" company their dividend percentage was very high.

## Stock Redemption Plan

On October 30, 1987, Technalysis' board of directors approved a stock purchase program. The program authorized the purchase of 200,000 shares of stock at up to $8 per share. The authorized purchase price was raised to $10 per share at the end of 1987 and, in 1988, raised again to $12 per share. During 1987 Technalysis purchased 14,150 shares. As of the end of 1988, Technalysis had purchased 47,275 shares under the plan. The directors believed that the stock purchase program would, along with dividends, provide interest in Technalysis shares and keep shareholders' confidence in their investment. That interest and confidence was considered necessary in order to provide a continuing source of capital, should it be needed.

## Expansion and Acquisitions

Petitioner's main office was located in Minneapolis, Minnesota, and it maintained branch offices in Detroit, Michigan, and Washington, D.C., during the years in issue. Petitioner opened a branch office in Seattle, Washington, in May 1988, but the branch was closed by the end of 1988.

Technalysis' management has looked into possible like-kind acquisitions. In 1985, petitioner investigated acquiring Reden Consultants, a smaller competing firm. Petitioner did not purchase Reden because the price was too high and because one of Reden's offices was in Minneapolis and petitioner did not want another office in Minneapolis. Petitioner also considered the acquisition of Lawson Professional Services. This transaction was never completed because the managers' personalities did not fit.

## OPINION

### General Background—Accumulated Earnings Tax

The accumulated earnings tax is imposed on the accumulated taxable income of "every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and

profits to accumulate instead of being divided or distributed." Secs. 532(a), 531. The accumulated earnings tax is a way of discouraging corporations from accumulating earnings not needed in conducting the business. *Snow Manufacturing Co. v. Commissioner,* 86 T.C. 260, 268 (1986). The tax is considered to be a penalty and, therefore, has been strictly construed. *Ivan Allen Co. v. United States,* 422 U.S. 617, 626 (1975).

The most important factor in deciding if the accumulated earnings tax applies is whether a corporation accumulates earnings and profits beyond the reasonable needs of the business. *United States v. Donruss Co.,* 393 U.S. 297, 307 (1969). Section 533(a) establishes the presumption that a corporation that permits earnings and profits to accumulate beyond the reasonable needs of the business does so with the purpose of avoiding income tax with respect to its shareholders. The presumption can be rebutted by a preponderance of evidence to the contrary. Sec. 533(a); *Snow Manufacturing Co. v. Commissioner, supra* at 269. Therefore, the accumulated earnings tax does not apply if a corporation has allowed an unreasonable accumulation but lacks the proscribed purpose or intent. *Pelton Steel Casting Co. v. Commissioner,* 28 T.C. 153, 173 (1957), affd. 251 F.2d 278 (7th Cir. 1958).

*Application to Publicly Held Corporations*

Petitioner argues that the accumulated earnings tax was not meant to be applied to a publicly held corporation which has no group of shareholders that controls more than 50 percent of the stock. Petitioner maintains that unless the corporation is so controlled, a widely held corporation cannot possess the requisite intent. Respondent argues that the plain language of the statute, as a matter of law, exposes all corporations to the accumulated earnings tax, regardless of the number of shareholders. Respondent contends that the accumulated earnings tax can apply to a publicly held corporation, and that whether the requisite intent to avoid income tax exists is a question of fact.

We addressed this issue in *Golconda Mining Corp. v. Commissioner,* 58 T.C. 139, 158, supplemented by 58 T.C. 736 (1972), and held that "as a matter of law * * * the accumulated-earnings tax can apply to publicly held corpora-

tions." (Fn. ref. omitted.) That opinion contained the explanation that the accumulated earnings tax should only be imposed on a publicly held corporation whose management group is dominated by a single large shareholder, or a group of large shareholders, who exercises effective control over the corporation. This reasoning stems from language in an earlier draft of section 532 contained in H.R. 8300, 83d Cong., 2d Sess., sec. 532 (1954), which, prior to enactment in the Internal Revenue Code of 1954, contained a provision exempting from the accumulated earnings tax any corporation with more than 1,500 shareholders and not more than 10 percent of the stock held by any individual. This language was not in section 532 as finally enacted or as it now exists. The theory behind this early draft was that effective control by the shareholders was necessary to ascribe the proscribed purpose to the shareholders.[2]

The Court of Appeals for the Ninth Circuit, in reversing this Court, held that the accumulated earnings tax is not applicable to publicly held corporations. *Golconda Mining Corp. v. Commissioner*, 507 F.2d 594, 597 (9th Cir. 1974).[3] The Court of Appeals' opinion contained the rationale that Congress, in reenacting the accumulated earnings tax provisions in the Internal Revenue Code of 1954, did not intend to change the application of the tax to include publicly or widely held corporations. *Id.* The Court of Appeals' opinion contained reasoning that "Congress did not intend to change the longstanding practice and application of the [accumulated earnings] tax to closely held corporations and these corporations alone." *Id.*

In 1984 legislation, Congress added section 532(c), which nullifies the Court of Appeals' holding in *Golconda* and makes clear that the accumulated earnings tax is not limited to closely held corporations. Section 532(c) contains the statement that the application of the accumulated earnings tax "shall be determined without regard to the number of share-

---

[2] Possibly, it was considered that dilution of ownership diminished the potential benefit from a corporation's accumulation of profits to a point where it becomes de minimis. Although this type of reasoning could be considered in a factual determination of whether the proscribed purpose existed, it certainly would not, per se, prohibit the possibility of imposing the accumulated earnings tax on a publicly held corporation.

[3] Subsequent to the Court of Appeals' decision in *Golconda Mining Corp. v. Commissioner*, 507 F.2d 594 (9th Cir. 1974), the U.S. Court of Claims, in *Alphatype Corp. v. United States*, 211 Ct. Cl. 345, 38 AFTR 2d 76-6019, 76-2 USTC par. 9730 (1976), held that the accumulated earnings tax can be applied to publicly held corporations.

holders of such corporation." The conference report issued in connection with the enactment of section 532(c) contains the statement that "the mere fact that a corporation is widely held does not exempt it from the accumulated earnings tax. This rule applies to operating companies, as well as mere holding or investment companies, regardless of how concentrated the ownership of their stock may be." H. Conf. Rept. 98-861, at 828 (1984), 1984-3 C.B. (Vol. 2) 1, 82.

Section 532(a) does not expressly limit the application of the accumulated earnings tax to closely held corporations.[4] That limitation had its source in preenactment drafts of proposed versions of section 532 containing limitations on the application of the accumulated earnings tax to corporations with up to a certain number of shareholders. Moreover, the language of section 532(a) does not require direct shareholder involvement or control in corporate management. It only requires that the "corporation * * * [was] formed or availed of for the purpose of avoiding the income tax with respect to its shareholders". To the extent that doubt existed about congressional intent regarding the application of the accumulated earnings tax to widely held corporations, section 532(c) has explicitly resolved them. The accumulated earnings tax can apply to a corporation regardless of how the stock is held.

In 1972, before the enactment of section 532(c), this Court reasoned in *Golconda Mining Corp. v. Commissioner,* 58 T.C. 139 (1972), that the accumulated earnings tax should be imposed on a publicly held corporation that is effectively controlled by a single shareholder, or a group of shareholders. *Id.* at 158. That rationale was the next logical step from existing case law and a point of view derived from the legislative history in existence prior to the enactment of section 532(c). It is not necessary here to engage in the type of analysis we used in our *Golconda* opinion because of section 532(c).

Although widely held corporations can be subject to the accumulated earnings tax, the fact that corporate shares of

---

[4] Sec. 532(a) provides:

SEC. 532(a). GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * [with certain exceptions not pertinent here] formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

ownership are widely dispersed may be considered, on a case-by-case basis, in order to determine whether the proscribed purpose exists.[5] Theoretically, however, it is not necessary that those who are responsible for the existence of the accumulation and proscribed purpose (officers and/or directors) also be shareholders.

Normally, corporations are managed under the direction of the board of directors. Traditionally, the shareholders elect the directors who, in turn, select the officers. Henn & Alexander, Laws of Corporations and Other Business Enterprises, sec. 203, at 550-551 (3d ed. 1983). The board of directors is ultimately responsible for determining and executing corporate policy. *Id.* sec. 207, at 563-564; see Minn. Stat. sec. 302A.201 (1992). The board has a fiduciary duty to the corporation and, accordingly, the directors must act in good faith for the best interest of the corporation, not the shareholders.[6] Any breach of the fiduciary duty may be actionable under the Federal securities laws. Henn & Alexander, *supra* sec. 235, at 626-627. In order to determine whether a corporation was formed or availed of for the proscribed purpose, we must consider the actions of the individuals who set corporate policy, whether or not those individuals are shareholders. This is the focus of the inquiry. If the directors and/or officers who effect corporate action and policy are also shareholders, that factor may have some probative value in determining whether the proscribed purpose existed.

The accumulated earnings tax can apply to a publicly held corporation if such corporation was formed or availed of for the purpose of avoiding income tax with respect to its shareholders. Whether the corporation possesses the proscribed purpose is a question of fact, *Helvering v. National Grocery Co.,* 304 U.S. 282 (1938), and a publicly held corporation does not lack such intent as a matter of law. Sec. 532(c); *Golconda Mining Corp. v. Commissioner,* 58 T.C. at 160.

---

[5] The statute does not require that the shareholder(s) personally cause the avoidance, but such consideration may have probative value in determining whether the proscribed purpose exists.

[6] The board of directors has a fiduciary duty to the shareholders inherent in its fiduciary duty to the corporation. The board cannot favor one intracorporate group to the detriment of another, and it cannot authorize transactions that oppress minority shareholders. Henn & Alexander, Laws of Corporations and Other Business Enterprises, sec. 240, at 652 (3d ed. 1983).

*Petitioner's Reasonable Business Needs*

Petitioner filed a motion to shift burden of proof on April 6, 1992, pursuant to section 534(c). In an order dated May 13, 1992, petitioner's motion was partially granted and respondent bears the burden of proof with respect to the stock redemption plan and the dividends paid to shareholders. Petitioner bears the burden of proof for the remaining issues.

The working capital needs of a business are commonly evaluated by means of the *"Bardahl* formula". *Bardahl Manufacturing Corp. v. Commissioner,* T.C. Memo. 1965-200. Both parties provided expert witnesses in support of their respective approaches to computing the working capital needs of petitioner. In computing Technalysis' working capital needs with the *Bardahl* formula, petitioner's expert used a 29-day business cycle and the succeeding years' operating expenses. Respondent's expert used a 22-day business cycle and the current years' operating expenses. We do not agree with either party's expert. We think that petitioner's working capital needs should be computed using a 22-day business cycle and the succeeding years' operating expenses. See *id.* Therefore, we find petitioner's working capital needs, computed using the *Bardahl* formula, for 1986, 1987, and 1988 to be $2,526,695, $3,179,233, and $3,578,723, respectively. See appendix.

To reach excess working capital where net liquid assets exceed accumulated earnings and profits, the working capital needs generally are subtracted from accumulated earnings and profits, not from net liquid assets. *Snow Manufacturing Co. v. Commissioner, supra;* see *Hughes, Inc. v. Commissioner,* 90 T.C. 1, 20 n.16 (1988). Therefore, in 1986, 1987, and 1988, petitioner had excess working capital of $2,820,193 ($5,346,888–$2,526,695), $2,902,809 ($6,082,042–$3,179,233), and $3,484,041 ($7,062,764–$3,578,723), respectively.

Petitioner justifies the remaining accumulation with the need for payroll reserves, the stock redemption plan, and expansion. In determining the reasonable needs of a business, its particular needs and circumstances must be considered. *Cheyenne Newspapers, Inc. v. Commissioner,* 494 F.2d 429, 432 (10th Cir. 1974), affg. T.C. Memo. 1973-52. Furthermore, a business can reasonably accumulate earnings and

profits in order to address risks specific to the industry. *Dielectric Matls. Co. v. Commissioner,* 57 T.C. 587, 599 (1972).

With respect to payroll reserves, a portion of petitioner's payroll is accounted for in the *Bardahl* computation because purchases (cost of goods sold) are primarily made up of salaries. However, an additional payroll reserve is reasonable because of petitioner's policy of retaining programmers through slow times and hiring qualified programmers even where work may not have been secured. Considering this particular business and its approach, we find that a 3-month payroll reserve of $350,000 a month [7] is reasonable. Therefore, for 1986, 1987, and 1988, $1,050,000 of petitioner's accumulated earnings and profits is justified as a reserve for payroll.

With respect to the stock redemption plan, petitioner was authorized to purchase 185,850 shares at $10 a share and 152,725 shares at $12 a share at the end of 1987 and 1988, respectively. We are convinced that petitioner's officers were not focusing upon any benefits that may have accrued to current shareholders due to the redemption. Instead, in their conservative manner, petitioner's board sought to maintain a potential market for the sale of additional shares should additional capital be needed. Additionally, there were no outstanding offers to or apparent interest in purchasing petitioner during the period under consideration. Petitioner, however, had considered the purchase of other related businesses.

Considering that respondent bears the burden of proof on this aspect of petitioner's needs, we find that this stock redemption plan was among the reasonable needs of the business and not employed for the proscribed purpose. It was therefore a reasonable need for petitioner to maintain a reserve to effect the stock redemptions of $1,858,500 and $1,832,700, for 1987 and 1988, respectively.

---

[7] Petitioner's expert claimed that petitioner's wage expense was $654,239, $759,549, and $941,060 per month for 1986, 1987, and 1988, respectively. However, no substantiation was provided for these amounts. According to the tax returns filed for the years in issue, the wage expense, exclusive of officers salaries and cost of goods sold, was $245,186, $261,365, and $332,572 per month for 1986, 1987, and 1988, respectively. We agree that the payroll reserve should cover a portion of the salaries used in the *Bardahl* computation, but we do not agree in duplicating petitioner's entire wage expense in computing petitioner's reasonable needs. Therefore, we think a wage expense of $350,000 per month is appropriate in calculating a wage reserve.

Petitioner maintained three branch offices during the years in issue. Petitioner's officers and directors intended that part of the reserves be for future branch offices or acquisitions of similar businesses. Due to the absence of sophisticated tax advice, these plans were not committed to writing. Section 1.537-1(b), Income Tax Regs., contains the statement that to justify the accumulation as a reasonable future need, the corporation must have "specific, definite, and feasible plans". Sec. 1.537-1(b), Income Tax Regs. Taxpayers, however, are allowed to accumulate earnings for reasonably anticipated needs, not solely for certainties. *Myron's Enter. v. United States,* 548 F.2d 331, 335 (9th Cir. 1977). Specificity and definiteness, coupled with action toward achieving the claimed purpose, are essential in finding the accumulation reasonable. *Dixie, Inc. v. Commissioner,* 277 F.2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958). Although we believe that petitioner's officers and directors were receptive to the idea of expanding if the opportunity was presented to them, we cannot find that petitioner had specific, definite, and feasible plans to expand. Therefore, no portion of petitioner's accumulated earnings and profits can be justified by possible future expansion or acquisition.

Therefore, for 1986, 1987, and 1988, petitioner had accumulations of earnings and profits, reasonable needs, and for 1986 and 1988 accumulation beyond the needs of the business, as follows:

|  | *1986* | *1987* | *1988* |
|---|---|---|---|
| Accumulated earnings and profits | $5,346,888 | $6,082,042 | $7,062,764 |
| Reasonable needs of the business: |  |  |  |
| Working capital | 2,526,695 | 3,179,233 | 3,578,723 |
| Payroll coverage | 1,050,000 | 1,050,000 | 1,050,000 |
| Stock redemption | -0- | 1,858,500 | 1,832,700 |
| Total needs | 3,576,695 | 6,087,733 | 6,461,423 |
| Accumulation beyond reasonable needs | 1,770,193 | -0- | 601,341 |

*Was Petitioner Formed or Availed Of for the Purpose of Avoiding Income Tax With Respect to Its Shareholders?*

If a corporation has an unreasonable accumulation of earnings and profits, that creates a rebuttable presumption that

the corporation had the purpose to avoid income tax with respect to its shareholders. That presumption can be overcome by a preponderance of the evidence to the contrary. Sec. 533(a). Having found that petitioner had an accumulation of $5,346,888, $6,082,042, and $7,062,764 for 1986, 1987, and 1988, respectively, and reasonable needs of $3,576,695, $6,087,733, and $6,461,423, we now decide whether the proscribed purpose existed with respect to the accumulations beyond the reasonable needs of the business, in the amounts of $1,770,193 and $601,341, for 1986 and 1988, respectively.

To determine whether a publicly held corporation possesses the proscribed purpose, we must examine the intent and actions of the people who manage and direct the corporation. As a general rule, corporate management is within the control and/or direction of the board of directors. In this case, the board of directors set the corporate policy. Therefore, we must decide whether petitioner's board of directors accumulated earnings and profits with the intent to avoid income tax with respect to its shareholders. Section 1.533-1(a)(2), Income Tax Regs., sets forth factors to be considered to determine whether a corporation had the proscribed purpose. Some of the relevant factors are: (1) Dealings between the corporation and its shareholders for the personal benefit of the shareholders; for example, personal loans; (2) corporate investment of undistributed assets in unrelated businesses or investments; and (3) the corporation's dividend history. Sec. 1.533-1(a)(2)(i), (ii), and (iii), Income Tax Regs.

Petitioner argues that consideration of the regulation's factors shows that petitioner did not have the requisite intent. There were no shareholder loans or investments in unrelated businesses or opportunities. Furthermore, petitioner points out that it paid dividends during each of the years in issue, and the amount increased during the years under consideration.

Respondent maintains that each member of the board of directors, especially Rocchio, reduced his individual income tax liability because Technalysis paid lower dividends than it could have. Because the officers and directors personally benefited, respondent argues that they accumulated the earnings instead of paying higher dividends in order to avoid income tax with respect to petitioner's shareholders. We note, however, that the officers, including Rocchio, had substantial

increases in their salaries over the years in issue. The increase in salary did increase their personal income tax liability.

We recognize that it is the responsibility of the corporate officers and directors to determine the reasonable needs of the business. Therefore, the judgment of corporate management is not to be ignored in determining if the accumulation of earnings and profits is unreasonable. *Faber Cement Block Co. v. Commissioner,* 50 T.C. 317, 329 (1968). We are reluctant to substitute our business judgment for the judgment of the officers and directors unless the facts and circumstances of the case require us to do so. *Snow Manufacturing Co. v. Commissioner,* 86 T.C. 260, 269 (1986).

The testimony of the officers and directors at trial indicated that they felt that the accumulation of the earnings and profits was necessary for two main reasons. First, they were involved in a personnel-intensive business, and they needed cash reserves to meet payroll in accord with their employment policy or in case of an economic downturn. It was petitioner's management policy to maintain skilled professional employees even when the needs of the clients did not require use of all employees. This policy was driven by the difficulty encountered in securing the expertise necessary to be successful in this service business. Second, petitioner was involved in a highly competitive and volatile industry in which accumulations were necessary to provide a strong financial position in case of any unexpected changes in the industry. Even though a portion of the accumulation was not found to be for the "reasonable needs" of petitioner's business, we do not find that it was for the shareholders' direct benefit.

Therefore, we hold that petitioner was not formed or availed of by its officers or directors to avoid income tax with respect to its shareholders, and the accumulated earnings tax does not apply.

*Decision will be entered for petitioner.*

## APPENDIX

### Bardahl Computation

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Billing ratio cycle: |  |  |  |
| 22-day business cycle | 6.0274% | 6.0274% | 6.0274% |
| Sales to rec. ratio: |  |  |  |
| Total sales | $13,212,463 | $14,233,649 | $17,317,098 |
| Average A/R | $2,087,537 | $2,300,884 | $2,608,653 |
| Ratio | 15.7998% | 16.1651% | 15.0640% |
| Purchases to payable ratio: |  |  |  |
| Total purchases | $7,168,200 | $7,639,033 | $9,226,366 |
| Average A/P | $165,402 | $155,436 | $216,598 |
| Ratio | 2.3074% | 2.0348% | 2.3476% |
| Net operating cycle | 19.5198% | 20.1577% | 18.7438% |
| Annual operating exps. | $12,944,269 | $15,771,805 | $19,092,835 |
| Working capital needs | $2,526,695 | $3,179,233 | $3,578,723 |

### Excess Working Capital

|  | 1986 | 1987 | 1988 |
|---|---|---|---|
| Accumulated E&P | $5,346,888 | $6,082,042 | $7,062,764 |
| Current op. needs | (2,526,695) | (3,179,233) | (3,578,723) |
| Excess working capital | 2,820,193 | 2,902,809 | 3,484,041 |